Frederick FESEL, Plaintiff,

v.

MASONIC HOME OF DELAWARE,
INC., a Delaware Corporation,
Defendant.

Civ. A. No. 76–238.

United States District Court,
D. Delaware.

March 29, 1978.

Thomas S. Neuberger and John S. Grady, of Bader, Dorsey & Kreshtool, Wilmington, Del., for plaintiff.

Clement C. Wood and John H. Benge, Jr., of Allmond & Wood, Wilmington, Del., for defendant.

## OPINION

STAPLETON, District Judge:

This is an action brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* in which the plaintiff alleges sex-based discrimination in employment. The plaintiff, Frederick Fesel, is a registered nurse who is currently serving as a second lieutenant in the United States Air Force. The defendant, Masonic Home of Delaware, Inc., ("the Home"), is a non-profit corporation devoted to the care of elderly Masons, and their wives and widows. This Court has jurisdiction of the action pursuant to 42 U.S.C. § 2000e–5(f)(3).

In an Opinion dated March 14, 1977,[1] disposing of the defendant's motion for summary judgment, I reviewed the administrative proceedings which preceded the filing of this action. That account will not be repeated here. It is sufficient to state that I held at that time that plaintiff had complied with all of the jurisdictional requirements of Title VII.

I also concluded in the March 14, 1977 Opinion that the Home is not a bona fide membership club exempted from the requirements of Title VII by 42 U.S.C. § 2000e(b). The parties have stipulated that the evidence submitted in connection with the summary judgment motion constituted all of the available evidence on the private membership club issue and that the evidence would be made part of the trial record of this case, without the necessity of its being tendered at trial. By my Order of October 28, 1977, that evidence was made part of the trial record and my findings of fact and conclusions of law of March 14, 1977, concerning the private membership club issue, were incorporated into the findings and conclusions which I make in this

---

1. *Fesel v. Masonic Home of Delaware, Inc.,* 428 F.Supp. 573 (D.Del.1977).

Opinion. Therefore, there will be no further discussion of the bona fide membership club issue in this Opinion.

Finally, in the March 14, 1977 Opinion, I found that in order to make a determination as to whether sex is a bona fide occupational qualification ("bfoq") in the circumstances presented by this case, I would need a fully developed record on that issue. A trial was held from October 25 to 28, and on November 30, 1977. The bfoq issue is now ready for disposition. This Opinion constitutes the Court's findings of fact and conclusions of law.

## THE FACTS

The Masonic Home is a residential retirement home. In November of 1973, the Home had thirty guests, of whom twenty-two were female and eight were male. At the beginning of that month (on November 3 and 5, 1973), the Home advertised in two local newspapers[2] for a nurse's aide to serve on the 11:00 P.M. to 7:00 A.M. shift and for a nurse's aide to serve on the 3:00 P.M. to 11:00 P.M. shift. (DX-1). Plaintiff, who was at that time a third year nursing student at the University of Delaware, and an Air Force veteran, read the ad and called the Home on November 5, 1973. He advised the Director of Nursing Services at the Home, Mrs. Husted, that he wished to apply for the advertised positions. Mrs. Husted advised him that the Home did not employ male nurse's aides. Shortly thereafter, plaintiff had a female friend call the Home, recite the same qualifications which he possessed, and inquire about the advertised positions. That friend was urged to come to the Home and fill out an application.

The business of the Home is to provide twenty-four hour supervision and care for people of advanced years. The duties of a nurse's aide at the Home in 1973 included the providing of services involving intimate personal care of both male and female guests including dressing, bathing, changing of geriatric pads for incontinent patients, tending to patients with catheters, and assisting in the use of toilets and bed pans. Nurse's aides did provide other functions, however, which did not involve such personal care including the making of beds, foot care, reading of mail, feeding, cleaning spills, maintenance of wheel chairs and the escorting of patients on visits to doctors.

On the same dates in November of 1973 when the Home advertised for nurse's aides, the Methodist Country House ran similar ads in the same newspapers. (DX-1). Plaintiff also called the Methodist Country House to apply for these positions, with similar results.

On November 5, 1973, plaintiff filed a charge of discrimination against the Home with the Equal Employment Opportunity Commission ("EEOC"). (PX-38). He filed a similar complaint against the Methodist Country House at the same time. (DX-19). Although plaintiff received right to sue letters relating to the complaints against both homes, he never filed a lawsuit against the Methodist Country House. In 1976, plaintiff reached a settlement agreement with the Methodist Country House, whereby he accepted $750 and released the Country House from any liability.

After November 5, 1973, the Masonic Home filled the two advertised positions (as well as a part-time position) with female nurse's aides. Plaintiff continued to seek employment as a nurse's aide and was hired by the Community Memorial Hospital in Jennersville, Pennsylvania where he started working on November 19, 1973. Plaintiff received his Bachelor of Science degree in Nursing from the University of Delaware in June of 1976. In May of 1977, he re-enlisted in the Air Force for a term of three years.

■ Plaintiff acknowledged that he has substantially mitigated the injury incurred by way of lost wages and seeks back pay only for the two week period between No-

2. The Wilmington *Morning News* and *Evening Journal*.

vember 5 and November 19, 1973.[3] While plaintiff originally sought "reinstatement" when he filed this action on July 16, 1976, his counsel represented prior to the commencement of trial that plaintiff was to become a first lieutenant by December of 1977 and that he intends to pursue a career in the Air Force as a nurse. Therefore, plaintiff has abandoned his reinstatement request. Despite the fact that he no longer seeks reinstatement, plaintiff does seek a declaratory judgment and an injunction directing that the Home cease its allegedly discriminatory policy.

## PLAINTIFF'S PRIMA FACIE CASE

■ Plaintiff has demonstrated that he is a male, that he applied and was qualified for the nurse's aide positions for which Masonic Home was seeking applicants, that he was rejected by Masonic Home, and that thereafter, those positions remained open and the Home continued to seek applicants. Under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), plaintiff has established a *prima facie* case of sex discrimination. The burden, therefore, shifts to Masonic Home to articulate a legitimate, nondiscriminatory reason for, or a statutory defense to, plaintiff's rejection. *See Jurinko v. Edwin L. Wiegand Co.,* 477 F.2d 1038 (3rd Cir.), *vacated and remanded on other grounds,* 414 U.S. 970, 94 S.Ct. 293, 38 L.Ed.2d 214 (1973).

## THE BFOQ DEFENSE

1. *The Employer's Burden of Proof*

■ Section 703(e) of Title VII, 42 U.S.C. § 2000e–2(e), provides, in pertinent part:

Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees . . on the basis of . . . religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise . . ..

In addition to this statutory exception, the Equal Employment Opportunity Commission has issued guidelines interpreting the bfoq exception as it relates to discrimination because of sex, at 29 C.F.R. § 1604.2. Those guidelines state, in pertinent part:

(a) The Commission believes that the bona fide occupational qualification exception as to sex should be interpreted narrowly. . . . (1) The Commission will find that the following situations do not warrant the application of the bona fide occupational qualification exception:

* * * * * *

(ii) The refusal to hire an individual based on stereotyped characterizations of the sexes. . . . The principle of nondiscrimination requires that individuals be considered on the basis of individual capacities and not on the basis of any characteristics generally attributed to the group.

(iii) The refusal to hire an individual because of the preferences of coworkers, the employer, clients or customers. . .

A portion of these guidelines has recently been approved by the Supreme Court in

---

**3.** Defendant contends that plaintiff is barred from any back pay recovery by his recovery of $750 from the Methodist Country House as part of the settlement agreement. While Section 706(g) of Title VII, 42 U.S.C. § 2000e–5(g), provides that back pay awards must be reduced by "interim earnings or amounts earnable" by the plaintiff, I cannot conclude that the $750 settlement sum represented back pay, or that any award to the plaintiff in this action would represent a double recovery. The evidence in the record does not indicate to me that the settlement represented the release of a

claim for back pay for the period from November 5 to 19, 1973. In fact, the main concerns of the parties in reaching their settlement agreement were other than possible back pay liability. Although I am unwilling to say that possible exposure to back pay liability was not one consideration in the settlement, I am unable to apportion any amount of the $750 to back pay. Accordingly, if the plaintiff in this case establishes Title VII liability on the part of Masonic Home, back pay will not be barred by the settlement agreement with the Methodist Country House.

*Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). There, the Court agreed "that the bfoq exception was in fact meant to be an extremely narrow exception to the general prohibition of discrimination on the basis of sex." 433 U.S. at 334, 97 S.Ct. at 2729. Due to the narrow interpretation of the bfoq exception, the burden put on the defendant to establish the exception is very heavy. *See, e. g., Weeks v. Southern Bell Telephone & Telegraph Co.*, 408 F.2d 228 (5th Cir. 1969).

As noted above, Section 703(e) of the act requires that the bfoq must be "reasonably necessary to the normal operation of that particular business." In *Diaz v. Pan American World Airways*, 442 F.2d 385 (5th Cir.), *cert. denied* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971), the court interpreted Section 703(e) of the Act to mean that in order for the employer to establish a bfoq defense, it must prove that "the essence of the business operation would be undermined by not hiring members of one sex exclusively." 442 F.2d at 388. In *Dothard, supra,* the Supreme Court apparently accepted the *Diaz* standard by holding that the bfoq defense had been established when the employer had shown that "[t]he employee's very womanhood would thus directly undermine her capacity to provide the security that is the essence of . . . ." her job responsibilities. 433 U.S. at 336, 97 S.Ct. at 2730.

■ Not only does the employer have to assert that hiring employees of one sex would undermine the essence of its business operation, but the employer must also show that it had a factual basis for believing that hiring any members of that sex would so undermine the business operation. *Weeks, supra; Long v. Sapp,* 502 F.2d 34 (5th Cir. 1974); *Meith v. Dothard,* 418 F.Supp. 1169 (M.D.Ala.1976), *affirmed in part and reversed in part sub nom. Dothard v. Rawlinson, supra; Cheatwood v. Southern Central Bell Telephone and Telegraph Co.,* 303 F.Supp. 754 (M.D.Ala.1969). In *Dothard v. Rawlinson,* the Supreme Court held that the employer must have a "basis in fact" for its belief that no members of one sex could perform the job in question. 433 U.S. at 335, 97 S.Ct. 2720. As I stated in my earlier Opinion in this case at 428 F.Supp. at 578:

> In order to succeed in its claim, the defendant will have to prove there is a factual basis for its contention that all or substantially all men would be unable to perform effectively the duties of the job of nurses aide.

### 2. The Added Burden In Bfoq Cases Based On The Privacy Rights Of The Customers

There are two general types of cases which deal with the bfoq defense. The first line of cases deals with those situations where an employer refuses to hire any members of one sex or hires by using criteria having a disparate sex-based impact due to the employer's perception of the physical capability of members of that sex to perform the required job responsibilities. *See, e. g., Dothard v. Rawlinson, supra; Long v. Sapp, supra; Diaz v. Pan American World Airways, supra; Weeks v. Southern Bell Telephone & Telegraph Co., supra; Rosenfeld v. Southern Pacific Co.,* 444 F.2d 1219 (9th Cir. 1971); *Bowe v. Colgate-Palmolive Co.,* 416 F.2d 711 (7th Cir. 1969). Although these cases are not very helpful in the disposition of the instant case, they do set forth several general principles concerning the application of the bfoq defense, some of which have been noted above in the discussion of the general burden of persuasion placed upon the employer.

The second line of cases deals with those situations where an employer refuses to hire any members of one sex due to the employer's perception of the privacy interests of its clients or customers, rather than the employee's physical capacity to perform the responsibilities connected with the job. *See, e. g., Meith v. Dothard, supra; Reynolds v. Wise,* 375 F.Supp. 145 (N.D.Tex. 1974); *City of Philadelphia v. Pennsylvania Human Relations Commission,* 7 Pa.

Cmwlth. 500, 300 A.2d 97 (1973); EEOC Decision 71–2410, 4 FEP 17 (1971). These cases do provide a starting point for analyzing the interrelationship of the privacy interests of the guests of the Masonic Home and the nondiscrimination principle of Title VII, in the context of the showing which an employer must be able to make in order to establish the bfoq defense.

The case law indicates that there are instances where the privacy rights of customers justify sex-based employment discrimination by an employer. *See, e. g., City of Philadelphia v. Pennsylvania Human Relations Commission, supra. See also Developments, Employment Discrimination and Title VII of the Civil Rights Act of 1964,* 84 Harv.L.Rev. 1109, 1185–6 (1971). However, in the instances when the bfoq defense is based on privacy interests of the customers, there is an additional showing required by the employer. The case law requires that in order for the employer to successfully interpose the bfoq defense, he must show that due to the nature of the operation of the business, it would not be feasible to assign job responsibilities in a selective manner so as to avoid a collision with the privacy rights of the customers.

For example, in *Reynolds v. Wise, supra,* at 151, the court dealt with the exclusion of female correctional officers from contact with male inmates. The court held that there was no violation of Title VII by selective work responsibilities because the exclusion of women was "reasonable to insure the privacy of inmates." However, the court did not indicate that total exclusion of women would lead to the same result. The same issue arose in *Meith v. Dothard, supra.* There, the court stated at 418 F.Supp. at 1185:

> This Court is of the opinion that this tension between the individual's right to employment without regard to his or her sex and the inmates' right to privacy can be resolved by selective work responsibilities among correctional officers rather than by selective job classifications. . .
> We are convinced that procedures may be arranged so as to alleviate much of the

legitimate inmate concern for privacy, short of denying women the job.

Thus, the court held that if the employer is able to avoid the conflict between the privacy rights of the customers and the nondiscrimination principle of Title VII by selective job responsibilities rather than total exclusion of members of one sex, it must do so and cannot rely upon the bfoq defense. When the Supreme Court reviewed *Meith,* it did not reach the privacy issue. However, Justice Marshall dealt with it briefly in his dissent, at 433 U.S. at 346, n.5, 97 S.Ct. at 2735. He said:

> The appellants argue that restrictions on employment of women are also justified by consideration of inmates' privacy. . .
> As the District Court suggested, it may well be possible . . . to rearrange work assignments so that legitimate inmate privacy concerns are respected without denying jobs to women.

EEOC Decision 71–2410, *supra,* also lends support to the view that an employer may not successfully interpose the bfoq defense on the grounds of the privacy interests of its customers unless it can make a showing that no assignment of selective job responsibilities can be made which would allow the employment of members of both sexes.

■ I agree with the proposition put forth in the cases cited. I hold, accordingly, that when an employer defends a sex discrimination action by raising the privacy interests of its customers as the basis for a bfoq defense, that employer must prove not only that it had a factual basis for believing that the hiring of any members of one sex would directly undermine the essence of the job involved or the employer's business, but also that it could not assign job responsibilities selectively in such a way that there would be minimal clash between the privacy interests of the customers and the nondiscrimination principle of Title VII.

### 3. *The Employer's Evidence*

■ In November of 1973, when the plaintiff attempted to submit an application

for employment to the Home, there were thirty guests residing there, of whom twenty-two were female and eight were male. The Home refused plaintiff an employment opportunity solely on the basis of his sex. The administrators of the Home believed that the employment of a male nurse's aide at the Home would have undermined the essence of the Home's operation because female guests would not consent to having their personal needs attended to by a male, and because some of the female guests would leave the Home if there were male nurse's aides. In addition, the Home contends that it could not hire a male nurse's aide and assign job responsibilities selectively in order to avoid the problem due to the size and duties of the staff and the numbers and gender of the guest population.

Doris Husted, the Assistant Superintendent at the Home and the Director of Nursing Services there, testified that it was her belief that the female guests would not accept personal care from male nurse's aides. She also testified as to her close relationship with many of the female guests, and to their modesty, attitudes and various episodes relating to the female guests' draping of their bodies when contact with male doctors or other males became necessary.

In September of 1976, Mrs. Husted approached nine of the female guests of the Home concerning whether or not they would fill in and sign affidavits reading:

> I, _____, have been a guest of the Masonic Home of Delaware for _____ years. I object most strenuously to the employment by the Home of male nurses or male nurses aides, if they are to attend to my nursing needs and, if one such is employed to attend to me, I shall do everything in my power to remove myself from the Home. (PX–39).

All nine guests filled in and signed the affidavits. The daughter of one female guest testified that if there were male nurse's aides at the Home, she would remove her mother from the Home. Two other children in similar positions testified that they would consider withdrawing their mothers from the Home if a male nurse's aide were employed there. Both the treating physician and the substitute physician at the Home testified that the presence of male nurse's aides at the Home would create a great deal of disturbance. Eight of the female guests at the Home,[4] at least three of whom had also been there in late 1973, testified that they would not consent to the presence of a male nurse's aide at the Home and would object to being cared for by a male. Mrs. Husted also testified that it was her opinion that the attitudes of the females at the Home in 1973 were substantially the same as they were at the time of trial. In addition, the plaintiff's expert, Mr. Waldman, testified that he would expect that some of the female guests would not consent to care by a male nurse's aide.

Although I question the value of the affidavits (PX–39) prepared by the administrators of the Home and signed by its guests, I am convinced by the other relevant evidence that many of the female guests would have objected, in 1973, to having their personal needs attended to by male nurse's aides. I am also convinced that the administrators of the Home had a factual basis for believing this in 1973.

As plaintiff stresses, the attitudes of the nonconsenting female guests at the Home are undoubtedly attributable to their upbringing and to sexual stereotyping of the past. While these attitudes may be characterized as "customer preference", this is, nevertheless, not the kind of case governed by the regulatory provision that customer preference alone cannot justify a job qualification based upon sex. Here personal privacy interests are implicated which are protected by law and which have to be recognized by the employer in running its business.

The Home has the responsibility of providing twenty-four hour supervision and care of its elderly guests. Fulfillment of that responsibility necessitates intimate

---

4. Seven of the eight female guests who testified had also signed the affidavit referred to above.

personal care including dressing, bathing, toilet assistance, geriatric pad changes and catheter care. Each of these functions involves a personal touching as to which each guest is privileged by law to discriminate on any basis. Because our tort and criminal laws recognize these personal privacy interests, the Home cannot legally force its female guests to accept personal care from males.[5] Since it is clear that a substantial portion of the female guests will not consent to such care, it follows that the sex of the nurse's aides at the Home is crucial to successful job performance. In this sense the hiring of male nurse's aides would directly undermine the essence of the Home's business and its belief to that effect in 1973 had a factual basis.[6]

However, this does not end the inquiry. As noted above, in a case such as this one, the defendant has the additional burden of proving that it could not selectively assign job responsibilities so that male nurse's aides could be hired but would not have to perform personal care services for nonconsenting female guests. There are three factors which require scrutiny in this context: (1) the possibility of a male nurse's aide to serve only male guests, (2) the feasibility of a male performing only services which do not involve intimate personal care for nonconsenting females, and (3) the work shifts at the Home, during which the number of staff on duty varies and during which different job responsibilities predominate. These three factors will be considered in reverse order.

The Home is operated on several different work shifts. The three basic shifts are from 7 A.M. to 3 P.M., from 3 P.M. to 11 P.M. and from 11 P.M. to 7 A.M. In addition, an extra shift is used during heavy workloads from 1 P.M. to 9 P.M. The openings advertised by the Home in November of 1973 and for which the plaintiff applied were the 11 to 7 and 3 to 11 shifts. At that time, there were two individuals working each of those shifts. Accordingly, since each nurse's aide would work only five days of the week, on two days of the week, each of them would be on duty alone. If there were a male nurse's aide on either shift, he would be alone on two days each week. However, if a male nurse's aide worked the 3–11 shift, and a female nurse's aide worked the 1 to 9 shift on those two days, the male would be on duty alone only between the hours of 9 and 11 P.M. on two days of the week.

Thus, assuming the best case for the plaintiff, that is, to be on duty on the 3 to 11 shift so that he would be alone for only two hours a day on two days of the week, the issue still remains whether it would be feasible for the Home to hire a male nurse's aide.

While the period from 9 to 11 P.M. is ordinarily a "quiet time" as compared with day time duty, geriatric pads are changed every two hours and various other personal care needs arise on an occasional and unpredictable basis. The need for intimate care by a female guest can arise at any hour.[7] There is a need for twenty-four hour supervision and care.[8] The record convinces me that it was not feasible for the Home to hire a male nurse's aide who would have to be on duty alone at any time for any period, due to the possibility of a need for personal care by a female guest who would not consent to a male nurse's aide. Due to the size of the Masonic Home, selective job assignment was simply not feasible in 1973.[9]

5. The question of the preferences of the male guests at the Home was not explored at trial. However, since the male guests do presently accept care from female nurse's aides, there does not appear to be any problem of nonconsenting male guests.

6. See Dothard v. Rawlinson, supra, 433 U.S. at 334–6, 97 S.Ct. 2720.

7. Although many of the guests are "self-care", they may still need a nurse's aide's assistance from time to time. Moreover, there are a number of "partial care" and "total care" guests.

8. Mrs. Husted testified that nurse's aides spend about thirty percent of their time attending to the personal needs of the guests.

9. In a larger home with more staff, selective assignment of job responsibilities might well be more feasible. For example, if there were at least two nurse's aides on duty at all times, and

**1354**

Plaintiff also argues that the Home could have hired a female "swing person" to be a nurse's aide during those hours when the male would otherwise have been alone on duty.[10] The male nurse's aide could then have tended to the personal care needs of the eight male guests [11] and to other tasks not involving the personal care of nonconsenting female guests. Such a solution would, of course, give the Home less flexibility, e. g., in situations where two female guests need personal care at the same time. Moreover, I cannot see how a swing person could be used without the imposition of an added expense upon the defendant. I do not believe that any duty to accommodate the rights of prospective male employees goes so far as to require the employment of additional personnel.[12]

In conclusion,[13] I find that the Masonic Home has shown that it had a factual basis for believing that the employment of a male nurse's aide would directly undermine the essence of its business operation because (1) many of the female guests would not consent to intimate personal care by males, and (2) the operation of the Home in November of 1973 was such, and the size of the staff was sufficiently small, that the Home could not hire a male nurse's aide for any shift in such a manner that there would always be at least one female on duty to attend to the personal care needs of those female guests objecting to male care. Under these narrow circumstances, I conclude that Masonic Home has met its burden of proof and has successfully established a bfoq defense based upon the privacy interests of its guests.

■ Accordingly, judgment will be entered for the defendant.[14]

one were female, the Home might be able to assign all personal care of female guests to that aide, depending upon the actual numbers of male and female guests present. This appears currently to be the situation at the Home, where there are at least two nurse's aides on duty at all times during the 11 to 7 shift. I need not decide, however, whether it is currently feasible to have male nurse's aides at the Home, due to my decision that injunctive relief is inappropriate in this case. It does seem that the hiring of males would be feasible in a substantially larger home. *See, e. g.,* EEOC Dec. 71–2410, *supra,* where the home in question had 194 beds and a nursing staff of thirty persons.

10. This was suggested by plaintiff's expert, Arthur Waldman.

11. Due to the evidence surrounding the work shifts and job responsibilities, I do not believe that the presence of twenty-two female guests and eight male guests in November of 1973 adds anything to the resolution of the issue.

12. *Cf. Trans World Airlines v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). In that case, involving religious discrimination in employment, the Court found that Section 701(j) of Title VII, 42 U.S.C. § 2000e(j), as well as the EEOC Guidelines, 29 C.F.R. § 1605.1, required the employer to make "reasonable accommodations" to the religious needs of employees, but that the employer need not go so far as to place "undue hardship" upon itself from such accommodation. The Court held that "[t]o require TWA to bear more than a *de minimis* cost in order to give [Hardison] Satur-

days off is an undue hardship." The case suggests that where a duty of accommodation exists, it nevertheless falls short of requiring the employer to sacrifice either efficiency or wages to accommodate the employee.

13. Plaintiff also argues that he was treated unequally in violation of Title VII because a Ms. A. Hamman applied for a position on March 22, 1973 and stated that she would not be available until June 18, 1973. Her application was held until June 18 when she began working at the Home. If plaintiff's application had been held until December 14, 1973, he could have been offered a position for the 1 to 9 shift when he never would have been on duty alone. Although it does not appear to me that plaintiff and Ms. Hamman were similarly situated, I need not decide the issue. By December 14, 1973, plaintiff had already been employed elsewhere for nearly a month. He does not, and could not, claim back pay from the Home for that period. Since I conclude below that injunctive relief is not appropriate in this case, there is nothing before me to decide concerning this claim.

14. As noted earlier, although plaintiff does not seek reinstatement, he does seek declaratory and injunctive relief directing the defendant to cease its allegedly discriminatory hiring policy. Since the conditions at the Home have changed somewhat between 1973 and the time of trial, the conclusion that the defendant was not in violation of Title VII in 1973 does not deal with whether the bfoq defense is equally valid in 1977 as well. However, I need not decide this issue. This is an individual, non-class action.

Any injunctive relief which plaintiff requests will not benefit him personally. Therefore, I hold that even if the plaintiff were able to prove a violation of Title VII by the Home in 1977, he would not be entitled to relief. Of course, injunctive relief granted to an individual in a non-class action may incidentally benefit persons not before the Court. *Stallings v. Container Corp. of America,* 75 F.R.D. 511 (D.Del. 1977); *Walker v. Robbins Hose Fire Co.,* 76 F.R.D. 218 (D.Del.1977); *Aiello v. City of Wilmington,* 426 F.Supp. 1272 (D.Del.1976); *du-Pont v. Woodlawn Trustees, Inc.,* 64 F.R.D. 16 (D.Del.1974). However, this line of cases does not deal with the situation where the individual plaintiff seeks no injunctive relief which will benefit him or herself. There is a line of Title VII cases holding that general injunctive relief will not be granted where there will be no benefit to the plaintiff. *See Gregory v. Litton Systems, Inc.,* 472 F.2d 631 (9th Cir. 1972); *Muller v. United States Steel Corp.,* 509 F.2d 923 (10th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); *Forst v. First National Bank of Washington,* 5 EPD ¶ 8063 (D.C.1972). There have been similar holdings in non-Title VII contexts, on mootness grounds. *See, e. g., Board of School Commissioners v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 874 (1975); *Zeller v. Donegal School District Board of Education,* 517 F.2d 600 (3rd Cir. 1975). Since injunctive relief would be inappropriate in this case, I do not make any findings of fact or conclusions of law regarding any aspect of the operation of the Home in 1977.