**Marion JENNINGS, Individually and on behalf of all other persons similarly situated, Plaintiff,**

v.

**NEW YORK STATE OFFICE OF MENTAL HEALTH and New York State Office of the State Comptroller, Defendants.**

No. 90 Civ. 5633 (GLG).

United States District Court, S.D. New York.

March 16, 1992.

Rowley, Forrest, O'Donnell & Hite P.C., Albany (Brian O'Donnell, of counsel), for plaintiff.

Robert Abrams, Atty. Gen. of State of N.Y., New York City (Nancy Miller Lerner, Marilyn T. Trautfield, of counsel), for defendants.

## OPINION

GOETTEL, District Judge:

This case, one of first impression in this circuit, explores the tension between the privacy interests of mental health patients housed in New York State facilities and the rights of Security Hospital Treatment Assistants to bid for assignments regardless of their gender as guaranteed by their collective bargaining agreement and secured by Title VII.

## BACKGROUND

Mid–Hudson Psychiatric Center ("MHPC") is a facility run by the New York State Office of Mental Health ("OMH"). It is a secure facility which houses the criminally insane, individuals accused of crimes but found incompetent to stand trial, and individuals who were previously housed in other OMH facilities as a result of civil commitments and thereafter became too dangerous for that type of environment, necessitating confinement in a more secure facility. MHPC has approximately 240 male and 40 female patients who are housed in wards by gender. Patient care at MHPC is accomplished via a "treatment team" consisting of registered nurses, medical doctors, psychiatrists, social workers, occupational therapists, recreation therapists and Security Hospital Treatment Assistants.

Class representative Marion Jennings is one of 250 Security Hospital Treatment Assistants ("SHTA") employed by MHPC. The job description for SHTAs indicates that these employees bear responsibility for both security and therapy. They must maintain order in groups and prevent injury to persons and property, apply restraints to patients on physician's orders, assist nurses and physicians in administering medication, feed, clothe and clean patients as required, assist patients in personal hygiene, participate in patient recreational, occupational and other therapy activities, escort and transport patients, and make and record observations about patients. In addition, when patients are sleeping, SHTAs are responsible for checking them in their beds every half hour except when a patient has been placed on special precautions requiring checking every fifteen minutes. Four shifts of SHTAs are scheduled every day.

The SHTAs are members of Local 2655 which is affiliated with New York State Inspection, Security and Law Enforcement Employees District Council 82, AFSCME,

AFL–CIO ("Council 82"). In 1985, OMH and Council 82 negotiated a memorandum of understanding which provided that SHTAs would have the right to bid by seniority for job assignments which included shift and building assignments. In December 1988, MHPC's Executive Director issued a policy which required that at least one SHTA of the same gender as the patients be present on the ward.[1] Available positions are now specifically designated as "male", "female", or "open" depending upon the staffing requirements at the time of the job opening. Thus, if a female SHTA desires a position which has been designated as "male", she is precluded from bidding for that position by virtue of her gender. In addition, this policy requires that, on occasion, SHTAs be temporarily placed in other ward assignments in order to ensure that an SHTA of the gender as the patients is present on the ward.[2] Overtime assignments are also affected by this new policy. Where, formerly, voluntary overtime was assigned on the basis of seniority, now, if staffing so requires, gender can be determinative of whether a volunteer receives overtime at any given time.[3]

On December 15, 1988, the male ward in which Marion Jennings, lead plaintiff in this action, was working had only two female SHTAs assigned. Because it was a male ward, another SHTA, also male, was assigned from the float pool to work there. When the need for another SHTA arose in another building, Jennings was assigned because she had less seniority than the other female SHTA. The male SHTA had less seniority than Jennings but could not be reassigned because his presence was required on the male ward by the gender policy. Jennings returned to her usual position during that same shift.

Jennings immediately filed a grievance with her union, which was denied the same day. She then escalated her grievance and, again, it was denied on the merits. After arbitration of the grievance, as required by the collective bargaining agreement, the arbitrator found no discrimination based on gender.

Jennings then filed a Charge of Discrimination with the New York State Division of Human Rights ("SDHR"), asserting that she was improperly transferred from her bid position on December 15, 1988 because of her sex. At that time, she did not raise the issue of the gender-based staffing policy's effect on overtime for the SHTAs. The SDHR found no probable cause to believe that OMH had engaged in the complained of discrimination. On June 6, 1990, the Equal Employment Opportunity Commission determined that a Title VII violation had not been established. This lawsuit followed. In February 1991, we certified a class consisting of all SHTAs who are currently employed at Mid–Hudson. The class consists of roughly 250 members; the membership of the class changes as individuals enter and leave employment at Mid–Hudson.

 Since its filing, the complaint has been amended twice. The current version alleges that the class' rights under Title VII, 42 U.S.C. § 2000e *et seq.*, have been violated by MHPC's institution of a gender-based assignment system. Specifically, plaintiffs allege that their contractual right to bid for certain positions in the hospital is limited by the hospital's gender-based assignment policy. They also allege that they have been and can be denied overtime work on the basis of their sex. The complaint states that the class representative, Marion Jennings, was reassigned from her bid position so that MHPC could satisfy its need for a female SHTA on another ward.

1. The staffing policy was revised in October 1990. However, the gender-based staffing policy remained basically intact.

2. Eight SHTAs, both male and female, complain that they were removed from their normal bid positions in order to satisfy the gender-staffing policy.

3. Two male SHTAs have alleged that they were denied voluntary overtime because the slots were designated as "female" and were thus assigned to female SHTAs with less seniority. This allegation is not disputed. Nine SHTAs assert that they were forced to work mandatory overtime in order to comply with the gender-based staffing policy.

It does not allege that Marion Jennings was denied overtime on the basis of her gender although it does assert that other class members have suffered this injury.[4] As relief, plaintiffs seek a judgment declaring that the staffing policy of MHPC is illegal.

Both parties are now moving for summary judgment.

## DISCUSSION

Federal Rule of Civil Procedure 56(c) provides that the trial judge shall grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. The threshold inquiry is whether there are genuine factual issues that must be resolved by a finder of fact because they may reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

■ Here, the parties both assert that the material facts in this case are undisputed and that the only issue to be resolved is their meaning. Where the summary judgment motions debate only the significance of undisputed facts, summary judgment is appropriate. *Longo v. United States Postal Service*, 953 F.2d 790 (2d Cir.1992). In deciding whether the moving party is entitled to judgment as a matter of law, all inferences must be drawn against the moving party, *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), and reasonable minds must not differ as to the import of the evidence before the court, *Cable Science Corp. v. Rochdale Village*, 920 F.2d 147, 151 (2d Cir.1990). With this jurisprudential

background in mind, we turn to the substantive issues raised by these motions.

## THE GENDER–BASED STAFFING POLICY

■ Under § 703(e)(1) of Title VII, an employer may discriminate on the basis of "religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e–2(e)(1). In this case, it is agreed that staffing assignments are made on the basis of gender and that discrimination is therefore taking place. Thus, the only question to be decided is whether the staffing policy at MHPC is one of those "certain instances" where gender is a bona fide occupational qualification ("BFOQ").

■ The BFOQ defense is a narrow exception to Title VII. *International Union, United Automobile, Aerospace & Agr. Implement Workers of America v. Johnson Controls, Inc.*, 499 U.S. ——, ——, 111 S.Ct. 1196, 1204, 113 L.Ed.2d 158 (1991); *Dothard v. Rawlinson*, 433 U.S. 321, 332–337, 97 S.Ct. 2720, 2728–31, 53 L.Ed.2d 786 (1977). Because the privacy interests of third parties are asserted as grounds for this BFOQ, this court must reach an affirmative conclusion for each prong of the following test: 1) the OMH has a factual basis for believing that it is necessary to staff at least one SHTA of the same gender on each ward in order to protect the privacy interests of the patients; 2) that the patients' privacy interest is entitled to protection under the law; and 3) that no reasonable alternatives exist to protect

---

**4.** Defendants argue that because Marion Jennings did not raise this claim before the EEOC and the SDHR, she is barred from asserting it in this action.

We may consider all matters which are reasonably related to the EEOC charge filed by the plaintiff, *Kirkland v. Buffalo Board of Ed.*, 622 F.2d 1066, 1068 (2d Cir.1980), so long as they address either the same type of discrimination contained in the EEOC charge or effects and results flowing from that kind of discrimination. *Almendral v. New York State Office of Mental Health*, 743 F.2d 963, 967 (2d Cir.1984).

The overtime claims arise out of the gender-based assignment policy because the need for placing an SHTA of a particular gender on a ward sometimes requires that an overtime assignment be given on the basis of sex. *See* Aff. of Charles Carlevaro (October 10, 1991), at ¶ 2. On this basis, we conclude that the overtime issue is part and parcel of the challenge to the gender-based assignment policy challenged by Jennings in her EEOC complaint and may be properly asserted in this case.

those interests other than the gender based hiring policy. *EEOC v. Sedita,* 755 F.Supp. 808, 809–10 (N.D.Ill.1991); *Fesel v. Masonic Home of Del., Inc.,* 447 F.Supp. 1346, 1349–51 (D.Del.1978), *aff'd,* 591 F.2d 1334 (3d Cir.1979). This test simply restates the well-accepted standards for analyzing whether a qualification for a job is legitimate.[5]

The Office of Mental Health which operates MHPC is charged with the care and safety of the mental patients confined in its facilities. In addition, it is charged by New York State law with the obligation to respect the privacy of the patients. N.Y. Mental Hygiene Law § 33.02 (McKinney's 1988) requires OMH to promulgate regulations giving patients the right to, *inter alia,* a safe and sanitary environment, a balanced and nutritious diet, freedom from abuse and mistreatment by employees or other residents of the facility, adequate grooming and personal hygiene supplies, and a reasonable degree of privacy in sleeping, bathing and toileting areas. The *Patient's Rights Handbook,* distributed upon admission, states that a patient has the right to visual privacy, privacy from odor, and privacy from noise. The Handbook indicates that these rights will be respected as treatment and security allow and that any contraindication of this right will be indicated in the patient's Uniform Case Record. Notice of Cross–Motion for Summary Judgment [hereinafter "Cross–Mo-

tion"], Aff. of Frank Cardinal (December 10, 1991), Exh. F.

Plaintiffs do not dispute that OMH is rightfully concerned with the privacy of the patients under its care. However, they contend that legitimate privacy concerns are adequately addressed in other ways, rendering its gender-based staffing policy superfluous. Thus, they argue that OMH has no fact-based justification for the policy.

The duties of the SHTAs' necessarily define the scope of the privacy interests which the current staffing policy is intended to protect. We will review the record accordingly.

Patients are prohibited from going into the toilets or the showers without being accompanied by an SHTA, pursuant to a rule promulgated by OMH. The bathrooms contain opaque doors which the patients can close in order to have physical privacy while they are in the toilet although these partitions have space at the top and the bottom which allows the SHTA to have some sense of what the patient is doing without direct observation. The showers are enclosed by opaque curtains which can be drawn by the patient while showering. The shower curtain does not run from floor to ceiling, making part of the patient's body visible. However, in the case of both the bathroom and shower, the SHTA is able to observe the patient sufficiently to assure security without observing the patient unclothed.[6] It should be

---

**5.** Where the safety and care of third parties is the business of the employer, to excuse the discrimination, the employer must show that the job qualifications are reasonably necessary to the normal operation of the particular business and that an individual possessing the discriminated against characteristic would be unable to perform safely and efficiently the duties of the job involved. *Western Air Lines, Inc. v. Criswell,* 472 U.S. 400, 413, 105 S.Ct. 2743, 2751, 86 L.Ed.2d 321 (1985). The first two prongs of test we are using here focuses this standard on the privacy needs of the residents at MHPC. In addition, there is precedent for requiring that the defendant show that some less restrictive alternative is not available to avoid the classification. *Dothard,* 433 U.S. at 329, 97 S.Ct. at 2726; *Harless v. Duck,* 619 F.2d 611, 616 (6th Cir.), *cert. denied,* 449 U.S. 872, 101 S.Ct. 212, 66 L.Ed.2d 92 (1980); *Griffin v. Michigan Dept. of Corrections,* 654 F.Supp. 690, 701 (E.D.Mich.

1982); *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**6.** Defendants assert in their Rule 3(g) statement that sometimes patients with physical disabilities or poor hygiene skills will actually have to be assisted in the bathroom or the shower. In addition, Marion Jennings stated at her deposition that when a patient required special precautions, Jennings would stand right outside the shower or bathroom, implying that Jennings would step into the shower or bathroom, invading the patient's privacy, if the patient required assistance. Cross–Motion, Dep. of Marion Jennings, at 43. *See also id.,* Dep. of Barber, at 28 (describing seeing patients disrobed when they were fighting in the shower); *id.,* Dep. of Edward Walsh, at 87 (stating that sometimes SHTAs would have to disrobe patients and com-

noted that the patients do not undress in the shower in front of the SHTA but instead disrobe in their rooms, then proceeding in a bathrobe to the shower.

Another SHTA duty which potentially implicates patient privacy is frisks. It appears that frisks are performed routinely at MHPC. In general, a frisk, which is performed by an SHTA either upon the patient's admission to the facility or on the orders of a physician, is limited to the arms and legs and an examination of the contents of the patient's pockets which the patient has emptied. In addition, a patient can be strip searched. *See* Cross–Motion, Dep. of Stephen Barber, at 46. These are conducted by a physician although in the presence of the SHTA who provides security. It is hospital policy to have an SHTA of the same gender perform all body searches no matter how invasive although we do not agree that the limited frisk violates the patients' privacy in any manner.

The record also indicates that SHTAs would have to disrobe a patient in order to apply restraints. *Id.*, at 26. Occasionally, the patient would be naked. *Id.*, at 27. Thus, on these occasions it was possible that an SHTA of the opposite gender would view a naked patient.

SHTAs are responsible for bedchecks at night. Each patient sleeps in his or her own bedroom and must be checked by an SHTA at least every half hour. The SHTA must enter the room to check the position and breathing of the patient.[7] The current policy dictates that patients be checked by an SHTA of the same sex. In addition, although it is recommended by the hospital that a patient sleep in clothing, patients are not compelled to do so.[8] Without an SHTA of the same sex doing the bedcheck, it is possible that a patient sleeping in the nude could be observed by an SHTA of the opposite sex. Indeed, in a grievance filed in September 1988, a male SHTA noted that on hot nights, some of the women patients discard their clothing in their sleep. Cross–Motion, Exh. J.

SHTAs are also required to assist patients in intimate personal care. According to the Personnel Director at MHPC, "this may involve assisting patients with toileting, showering, disrobing, and cleaning their genitals." *Id.*, Aff. of Frank Cardinal (December 10, 1991), at ¶ 13. Plaintiffs contend that although this task may be included in their job description, in reality, SHTAs do not perform this task. *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Cross–Motion, Exhibit C, at 29. They contend that, at most, an SHTA would have to hold a patient down while a physician or a nurse cleaned the patient. There is evidence to the contrary in the record but plaintiffs agree that the patient would be undressed and viewed by the SHTA, possibly of the opposite gender.

Another sensitive aspect of the SHTA position deals with personal hygiene. Necessary items such as sanitary napkins are handed out by the SHTAs which means

---

pel them to shower although he never personally did so).

**7.** The severity of the mental illness of the patients at MHPC dictates this close observation. For example, patients have attempted to commit suicide by stuffing socks into their mouths. In addition, the patients are sometimes heavily sedated; such dosages require frequent checks to safeguard against aspiration and respiratory problems.

**8.** In *Forts v. Ward,* 471 F.Supp. 1095 (S.D.N.Y. 1978), *aff'd in part, vacated in part,* 621 F.2d 1210 (2d Cir.1980), the court found that it was a violation of a female inmate's right of privacy to have male guards assigned to the night shift when she was sleeping. "From time to time a guard may look into or shine a flashlight into her cell without warning to see if she is there,

without any advance awareness of whether ..., if sleeping, her body is revealed because her bedding or night garments are disarrayed or cast aside. [A]n inmate may awaken in the morning to the awareness of the extent to which she has been on view during the night. There is inherent in the foregoing, the inmate being unable to protect herself, the risk of at least embarrassment or shame or humiliation from actual or potential viewing during the night by males whose duty it is to watch her." *Id.,* 471 F.Supp. at 1101. The Second Circuit assumed that inmates had a right not be viewed naked by guards of the opposite gender, *see Gargiul v. Tompkins,* 704 F.2d 661, 670 (2d Cir.1983) (Oakes, J., concurring), but reversed the lower court's bar on male guards' assignment to the night shift on the grounds that inmates could wear state provided pajamas if they chose. *Forts v. Ward,* 621 F.2d 1210, 1217 (2d Cir.1980).

that a woman may have to ask a man for a sanitary napkin. Deposition of Stephen Barber, at 33.

Plaintiffs assert that there has never been any objection by a patient to care by an SHTA of the opposite sex. This, however, is disputed by Dr. Tekben, the facility director, who states that female patients objected to having exclusively male SHTAs on the ward. Cross–Motion, Aff. of Erdogan Tekben (December 10, 1991), at ¶ 8. Moreover, the fact that a person does not assert his or her constitutional right does not mean that state run facilities are still not obligated to respect these same rights. Indeed, there have been objections on behalf of the patients by SHTAs who have felt that they were compelled to invade the patients' privacy by virtue of their gender.

For example, in September 1988, a male SHTA filed a grievance because a female patient experiencing a heavy menstrual flow needed assistance and no female SHTA was on duty in that ward nor available for immediate transfer. Cross–Motion, Dep. of Cardinal, at ¶¶ 101–102; *id.*, Aff. of Cardinal, ¶¶ 33–35, Exhibits J & K. She sought assistance from the male SHTA who felt that he was invading her privacy. He also voiced a general objection to being present when patients went to the bathroom at night clad only in scanty nightclothes. Other male SHTAs have objected to being present on female wards. *See* Notice of Motion [hereinafter "Motion"], Exh. X, at 65 (Barber stated that he had heard another male SHTA objecting to working on a female ward).

█ The range of duties performed by the SHTAs makes it clear that privacy interests of the patients are frequently implicated in the patient-SHTA relationship.[9] It was precisely those interests that MHPC sought to address through its gender-staffing policy.[10]

The rule is that there needs to be a direct relationship between the policy and the actual ability of the SHTA to perform its job. *Johnson Controls*, 111 S.Ct. at 1205. We are convinced that a person of the opposite gender would be unable to adequately perform some of the duties of an SHTA which affect the privacy rights of the patient and successfully respect those rights. An SHTA asked to clean the genitalia of a patient of the opposite sex would be unable to perform the function without viewing the patient's naked body. Similarly, an SHTA could not participate in the strip search of a patient of the opposite sex, *see* Motion, Dep. of Barber, at 46, 80, nor could they strip a violent patient and put them in their pajamas, *id.*, at 29, or put a patient in restraints, *id.*, at 27. Thus, the gender-based assignment policy which is intended to protect the privacy of the patients and the actual ability of the SHTA to perform its job are directly connected.

█ The next part of our analysis requires a determination of whether the patients' privacy interest is entitled to protection under the law. Although no court in

9. Still another SHTA responsibility, which OMH contends necessitates gender-based staffing, is the escorting of patients. New York law requires a female patient who is being transported to or from a facility to be accompanied by another female, unless accompanied by her father, brother, husband, or son. N.Y. Mental Hygiene Law § 33.17 (McKinney's 1988). The gender staffing policy is purportedly intended to make a female SHTA available for this duty. There is no requirement that a female patient be accompanied by another female when being moved within the facility. We do not agree that this particular duty provides a basis for the gender-staffing policy because it is unclear from the record that this is frequent enough occupance necessitating the presence of a female SHTA on the ward. Additionally, if a female patient is moved off the facility, the presence of at least one female SHTA on her ward may accommodate the requirements of state law but would necessitate the transfer of a female SHTA to the ward to satisfy the gender-staffing policy. Thus, assignment of a female SHTA to a female ward does not directly facilitate the need for a female escort for patients.

10. Defendants have also argued that the presence of at least one female SHTA on a female ward has a positive therapeutic effect on the patients and reduces the number of critical incidents there. The study submitted in support is highly criticized by the plaintiffs. We need not resolve this particular issue since we believe that just the day to day duties of the SHTA involves privacy interests of patients which dictate the presence of a female SHTA on a female ward.

this circuit has considered the issue, other courts, without exception, have found that the personal privacy rights of residents and patients in state health facilities can provide the basis for a BFOQ.

For example, in *Local 567 American Fed. of State, County & Mun. Employees v. Michigan Council 25*, 635 F.Supp. 1010 (E.D.Mich.1986), the court held that the privacy rights of mental health patients could justify a sex-based BFOQ. The court noted that requiring patients to have their naked bodies viewed or any number of personal services performed by a member of the opposite sex was a clear invasion of privacy. It then opined that these privacy rights justify a BFOQ for a worker who must provide personal hygiene care. *See also Jones v. Hinds General Hospital*, 666 F.Supp. 933 (S.D.Miss.1987) (hospital could terminate orderlies on the basis of gender in order to protect privacy interests of male patients); *Backus v. Baptist Medical Center*, 510 F.Supp. 1191 (E.D.Ark.1981) (hiring of male nurse would invade the privacy of obstetrical patients in hospital where nurse was obliged to perform sensitive or intimate tasks), *vacated as moot*, 671 F.2d 1100 (8th Cir.1982); *Fesel, supra*, 447 F.Supp. 1346 (gender-based hiring permitted for nurses in nursing homes). *Cf. Norwood v. Dale Maintenance System, Inc.*, 590 F.Supp. 1410, 1416–17 (N.D.Ill.1984) (allowing opposite sex attendants into washrooms while in use is an intrusion on personal privacy warranting a sex-based hiring policy); *Brooks v. ACF Industries, Inc.*, 537 F.Supp. 1122, 1133 (S.D.Va.1982) (male gender was a BFOQ for attendants in bathhouse used exclusively by men).

■ There are some cases concerning correction facilities which have held that inmates do not possess a protected right

under the Constitution against being viewed while naked by correctional officers of the opposite sex. *See, e.g., Griffin v. Michigan Dept. of Corrections*, 654 F.Supp. 690 (E.D.Mich.1982); *but see Gunther v. Iowa State Men's Reform.*, 612 F.2d 1079, 1086 (8th Cir.1980) (acknowledging right of inmates to shower and go to the bathroom without being viewed by guards of the opposite gender). However, we find the correction cases to be inapposite. MHPC is not a correctional facility. Cross–Motion, Aff. of Tekben, ¶ 6; Motion, Plaintiff's Statement of Material Facts, ¶ 1. The patients at OMH are not convicted criminals but instead are there as a result of civil commitments. Thus, their right to privacy may not be abrogated by virtue of their confinement in a state-run facility unlike a prison inmate who has forfeited some rights in repayment to society. The patients at OMH are just that, patients. They are vulnerable and mentally ill. Basic decency demands that their privacy be respected to whatever degree feasible. In addition, in this Circuit, even prison inmates are accorded some degree of privacy. *See Forts v. Ward*, 621 F.2d at 1216–17 (requiring state to provide women inmates with pajamas so that they could be clothed at night and secured from the view of prison guards of the opposite gender if they chose).

Finally, we must consider whether the gender-staffing policy is the least restrictive method to respect the patients' privacy rights at MHPC. *See Dothard*, 433 U.S. at 329, 97 S.Ct. at 2726. OMH argues that simply requiring the presence of one SHTA of the same gender as the patients on the ward is the most reasonable and least restrictive way to respect the privacy of the patients.[11] If the task being performed by

11. The gender staffing policy states that its goal is to assure that at least one SHTA of the same gender as the patients is present on the ward in order to balance the patients' privacy interests and the SHTAs' right to bid for job assignments:
1) If a float pool SHTA of the required gender is available, that person will be assigned;
2) If no float pool SHTA meets the requirement, then the least senior SHTA on duty that meets the gender requirement will be assigned;

3) If it is necessary to replace an SHTA called upon to satisfy the gender requirement, an SHTA ranking lowest in seniority that can be spared from another area will be assigned;
4) If there is no SHTA on duty of the gender required, one is to be hired from the preceding shift, using the preceding shift's existing overtime log book.
All other assignment of SHTAs will continue to be made on a gender-neutral basis.

an SHTA does not implicate patient privacy interests, it is clear that an SHTA of any gender will be able to successfully accomplish its job. However, if the patient's naked body must be viewed or the patient requires assistance with personal hygiene, then the availability of an SHTA of the same gender ensures that the privacy interests of the patient are respected. Thus, defendants suggest that having one SHTA of the same gender is the minimum that can be done to safeguard the privacy of the patients.

■ Plaintiffs dispute this. First, they contend that there were no studies conducted prior to the implementation of the policy which indicated the need for the presence of a same-sex SHTA on the ward. There is no requirement in the law, however, that formal studies be conducted to ascertain the need for a BFOQ nor have plaintiffs pointed us to any authority for this proposition. Plaintiffs' argument that there was never a belief that an SHTA was prevented from performing his or her job duties because of gender, *See* Motion, Dep. of Cardinal, at 88 ("Nobody said anyone was incapable of performing the duties of the position."), misses the point. When privacy issues are at stake, the focus on job performance in a vacuum is incorrect. The question is not whether the SHTA can perform the duties of a job regardless of his or her sex but whether that SHTA can satisfactorily respect the privacy of a patient in the performance of his or her job. We believe the answer to that question is "not always" when the SHTA is the opposite gender of the patient.

Plaintiffs also contend that the defendants failed to explore reasonable alternatives to protect patient privacy other than gender staffing. However, the record indicates that MHPC made changes to the physical plant whenever possible and could not come up with any other means to address the patients' privacy needs other than the institution of some gender-based assignment system. Cross–Motion, Aff. of Affidavit in Response to the Defendants' Statement Pursuant [to] Local Rule 3(G), Exh. B.

Tekben, ¶ 10. In addition, it is evident that the union participated in discussions of the policy and had the opportunity to bring up alternative proposals. None were made. *Id.,* ¶ 12; Dep. of Barber, at. 93 (stating that seniority was the sole issue in the labor-management discussions of the gender-based assignment policy and that neither the local nor the statewide union made any alternative proposals to MHPC).

Additionally, plaintiffs assert that the privacy needs of the patients are overstated by the defendants. For example, plaintiffs assert that the instances in which an SHTA would be asked to clean a patient are extremely rare. *See* Deposition of Stephen Barber, at 26 (testifying that in his nine years of employment at MHPC, he has never participated in washing a patient's genitals). However, an SHTA is present when a nurse or physician is cleaning the patient and when a patient is being strip searched. Although the record is vague concerning how many times an SHTA would be present at such a washing, or have to toilet a patient or take a patient into the shower to wash him or her, it remains clear from the record that these incidents do happen and are not rare occasions, and that such tasks are within the scope of the SHTAs' responsibilities.

To address this problem, plaintiffs suggest that if the task to be performed requires the presence of an SHTA of the same gender as the patient in order to secure the patient's privacy, the SHTA can be assigned from either the float pool [12] or transferred from another ward temporarily. The feasibility of this suggestion is questionable. Although some of the SHTAs' duties which implicate a patient's privacy are not emergencies, some are. Reassignment takes time and is highly impracticable as it would require frequent temporary reassignments of staff, would reduce the efficiency of operations, and would not maximize MHPC's ability to assure the privacy of the patients in emergencies. Cross–Motion for Summary Judg-

---

**12.** The float pool is a bid assignment where the SHTAs are not assigned to a particular ward but assigned as needed.

ment, Exh. P, Tekben Aff., ¶ 12. In addition, it is questionable whether the SHTAs would welcome frequent reassignments.[13] Thus, having an SHTA of the same gender as the patients on the ward present ensures that emergencies implicating a patient's privacy interests can be satisfactorily addressed quickly.

Plaintiffs argue that the curtains and partitions in the showers and bathrooms adequately protect the interests of the patients which is true except when the SHTA has to deal with an emergency in those facilities. Patients fight in the shower and must be separated. Cross–Motion, Dep. of Barber, at 28, 37. Moreover, though the patient is not directly observed while showering, he or she, while undressing, does not do so in complete privacy. Here, plaintiffs note correctly that curtains can be placed on the observation windows of the bedrooms to secure the patients' privacy. But this does not address the problem of the patient who must be continually observed or who must be assisted in undressing. In addition, patients disrobe in an open area before actually stepping into the shower. Thus, they can be observed by an SHTA of the opposite sex before closing the shower curtain. Cross–Motion, Dep. of Walsh, at 81–82. OMH contends that it has made all possible adjustments to the MHPC physical plant to address the privacy needs of its patients—other than suggesting curtains on the bedroom windows, plaintiffs have not proposed any other alterations which would safeguard the privacy interests of the patients at all times.

To address the bedcheck problem, plaintiffs suggest that patients can wear pajamas, issued by the state, if necessary.

This solution was found to be a reasonable alternative in the prison context. *See Forts*, 621 F.2d at 1217. We do not believe that state-issued pajamas presents a viable option here, however. This case concerns mental patients who, unlike the prisoners in *Forts*, may not have the capacity to control their behavior nor understand fully the ramifications of choosing not to wear pajamas. *Compare, id.*, 621 F.2d at 1217 ("[W]e do [not] agree that any legally enforceable rights of inmates sufficient to impair employment rights can arise from an inmate's preference for sleepwear of her choice or for none at all."). Moreover, there is still the chance that during the night, bedclothes will become disarrayed, revealing a body part normally kept under wraps and we do not accept the idea that the privacy rights of mental patients are reduced because of their confinement, unlike a prisoner's. Additionally, we note that patients begin to go to bed between 9:00 p.m., Motion, Exh. M, Dep. of Walsh, at 52, and 1:00 a.m., *id.*, Exh. W, at 46; patients begin arising at 6:45 a.m., *id.;* they may nap from 1:30 to 2:30 p.m. SHTAs are staffed on the wards in three shifts: the first shift goes from 6:45 a.m. to 3:00 p.m.; second shift is 2:45 p.m. to 11 p.m.; and the third shift is 10:45 p.m. to 7 a.m. Thus, bedchecks must be made at least during the second and third shifts, and possibly during the first. In addition, it appears that the first shift SHTAs would have to deal with the hygiene problems that are confronted upon rising in the morning and with bedchecks during a nap. This duty, even standing alone, would justify the presence of a same-sex SHTA on the ward at all times.[14]

---

**13.** OMH maintains that the SHTAs object to reassignments. Indeed, Marion Jennings' grievance, which provoked this suit concerned her reassignment to another ward for three hours. In addition, we have been informed that on February 10, 1992, a female SHTA filed a grievance which concerned her temporary reassignment on three separate occasions on February 3, 1992. First, she was reassigned because a female SHTA was needed to conduct a strip search of a female patient; the second reassignment was necessitated by a need for a female SHTA to cover admissions; the last reassignment occurred because a female patient needed

a female escort for an outside hospital trip. However, it is not clear from the grievance whether she was objecting on grounds of seniority or objecting to the gender staffing policy although we note that the remedy sought was elimination of that policy.

**14.** The record suggests that MHPC had concerns both about sexual abuse of patients by SHTAs of the opposite gender, Motion, Dep. of Barber, at 37, and about unfounded allegations of sexual abuse, *id.*, Aff. of Jasenn Zaejian, at ¶ 16. *See also id.*, Dep. of Barber, at 38, 43 (testifying about allegations of sexual abuse of female pa-

Plaintiffs additionally argue that of all the members of the treatment team, only the SHTA is subjected to gender requirements. They point out that male wards are staffed by female nurses, female wards have male psychiatrists. This, plaintiffs argue, supports their position that there is no need for gender-based assignments of the SHTAs. We disagree for several reasons. First, nurses and psychiatrists are trained medical personnel who are presumed to be objective when viewing the human body by virtue of their training. Second, nurses and psychiatrists are not on the wards continually as the SHTAs. Only the SHTAs are present in the wards twenty-four hours a day. Finally, only the SHTAs are responsible for checking the patients who are sleeping and the routine physical maintenance of the patient.

We believe that requiring the presence on the ward of at least one SHTA of the same gender as the patients is the least restrictive method to safeguard the privacy rights of the patients while respecting the SHTAs contractual right to bid for job assignments. The record is clear that there are potentially interactions between a patient and an SHTA which could violate the patient's privacy. The gender-based assignment policy strikes a balance between the patients' privacy interests and the right of SHTAs to bid for position. Thus, we find that the requirement that at least one SHTA of the same gender as the patients be assigned to the ward is permissible under Title VII.

## THE OVERTIME ISSUE

Defendants acknowledge that an effect of the gender-based staffing policy is that sometimes an SHTA volunteering for overtime will be precluded from an assignment if the policy requires that a SHTA of another gender be assigned. But, the same reasons making gender a BFOQ for the staffing of SHTAs make gender a BFOQ for overtime assignments. When there is need for an SHTA of a particular gender so that the gender-based staffing policy may be satisfied, an SHTA of that gender is selected from the overtime lists. If there is no need for an SHTA of a particular gender because the gender-based assignment policy has been satisfied, then gender is not the basis for making an overtime assignment. Notice of Motion, Exh. Z, at 35–37. Thus, if there is not at least one SHTA of the same gender as the patients on the ward, the privacy interests of the patients dictate that an SHTA of the same gender be selected from the overtime lists.

## CONCLUSION

Summary judgment is granted in favor of the defendants. Plaintiffs' motion for summary judgment is denied. The clerk will enter judgment in favor of the defendants.[15]

SO ORDERED.

tients by male employees). Given the isolated setting of the bedcheck, requiring an SHTA of the same gender as the patient to make the check protects both the patients and the SHTAs.

15. Defendants have argued that the wrong parties are before this court, noting that the staffing policy in issue is not a state-wide policy and was promulgated by the director of MHPC, not by OMH. Their position is that the proper defendant in this action is MHPC, not OMH or the Controller's office.

Plaintiffs agree that the disputed policy was promulgated by MHPC but believe that MHPC is not a juridical entity and that OMH must necessarily stay in the suit as the operator of MHPC. Defendants objected to plaintiffs' proposal to add MHPC to the caption. We need not resolve this question as we have addressed the merits of this case precluding a later suit against MHPC. We note that although generally defendants not named in the EEOC complaint may not be sued in Title VII actions, plaintiffs would have been able to demonstrate that there is "substantial identity" between OMH and MHPC, that MHPC had actual notice of the claims, and that the substance of the claims would remain unchanged, making the addition of MHPC as a defendant proper despite not having been named in the administrative proceedings. *See Giuntoli v. Garvin Guybutler Corp.*, 726 F.Supp. 494, 497–99 (S.D.N.Y.1989).