William AIKEN; and Disability Advocates, Inc. on behalf of all present and future patients of the Capital District Psychiatric Center who are subject to unlawful strip searches and body cavity searches, Plaintiffs,

v.

Jesse NIXON Jr., in his official capacity as Director of the Capital District Psychiatric Center and individually; Capital District Psychiatric Center, a public entity; and Gail Bellinger–Alleman, Thomas Deseve, Jay Edmond Harper, Richard Monte, Jo DiBlasio and Jeff Glebba, in their official capacities and individually, and Kathleen Cavanaugh, individually, Defendants.

No. 1:01–CV–73.

United States District Court, N.D. New York.

Sept. 30, 2002.

Disability Advocates, Inc., Albany, NY (Cliff Zucker, Esq., of counsel), for Plaintiffs.

Eliot Spitzer, Attorney General of the State of New York, Albany, NY (Nelson R. Sheingold, Esq., Assistant Attorney General, of counsel), for Defendants.

## MEMORANDUM—DECISION & ORDER

MCAVOY, District Judge.

## I. INTRODUCTION

This is an action brought pursuant to Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101, *et seq.;* § 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act" or " § 504"), 29 U.S.C. § 794, *et seq.;* 42 U.S.C. § 1983 (" § 1983") asserting deprivations of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution; and the New York State common law asserting tort claims sounding in "assault and battery" and negligence.

Defendants move pursuant to FED. R. CIV. PRO. 12(b)(6) to dismiss plaintiffs' claims under the ADA, the Rehabilitation Act, plaintiffs' claims for injunctive relief, and the § 1983 claims and pendent state law claims against defendants Nixon, Glebba, DiBlasio, and Cavanaugh. For the reasons that follow, the motion is granted in part and denied in part.

## II. BACKGROUND

The case surrounds the search policy of the Capital District Psychiatric Center ("CDPC") in Albany and the application of that policy when patients are voluntarily admitted there. As addressed more fully below, plaintiff William Aiken ("Aiken") alleges that on January 19, 2000 he was illegally strip searched and body cavity searched upon his voluntary admission to CDPC. Aiken serves as the representative plaintiff for the association claims brought by Disability Advocates, Inc. on behalf of all present and future patients of the Capital District Psychiatric Center who may be subjected to the challenged searches, Second Amended Complaint ("complaint" or "compl.") ¶ 12,[1] and who challenge the legality of the policy.

### A. January 19, 2000 search

The complaint alleges that in October of 1998, Defendant Kathleen Cavanaugh, then-CDPC Program Director and Supervisor of the crisis nursing staff, placed a "standing order" on Aiken's clinical record at CDPC which ordered staff in the crisis unit of CDPC to carefully search Aiken whenever he appeared for admission. Compl. ¶¶ 32–33. Plaintiffs contend that Cavanaugh lacked probable cause to issue this standing order and that it was issued in violation of CDPC's search policy. Compl. ¶¶ 36–40.

On January 19, 2000 Aiken sought voluntary admission for emergency psychiatric care and treatment at CDPC's crisis unit. Compl. ¶¶ 43, 49. He was strip searched and visual body cavity searched by defendants DeSeve, Harper, and Monte in a bathroom, allegedly pursuant to the direct order of defendant Bellinger–Alleman. Compl. ¶¶ 51–57. Plaintiffs allege that Aiken's search was unreasonable in scope and without probable cause or a warrant, and therefore in violation of his constitutional rights. Compl. ¶ 105.

Many of the defendants' arguments turn on whether this search occurred in accordance with—or in contravention to—the CDPC policy in issue. Plaintiffs contend that "plaintiff Aiken and other CDPC patients" were "searched pursuant to the illegal policy." Compl. ¶ 104. However, the complaint also alleges that Aiken's January 19, 2000 search deviated in certain material respects from the requirements of

---

1. On October 1, 2001, plaintiffs filed their Second Amended Complaint ("complaint") in the case at bar which alleges several federal and state law claims against CDPC and various officials of CDPC as indicated above.

the policy. *See* Compl. ¶¶ 51–57, 65–75.[2] As addressed more fully below, plaintiffs seem to argue that this search was conducted pursuant to the *authority* of the policy (which they assert is itself unconstitutional), and further that the manner of search (the deviations from the policy) compounded Aiken's injury.

### B. CDPC's Search Policy

With regard to the policy, plaintiffs contend that CDPC's written policy authorizes unconstitutional strip searches, visual body cavity searches, and internal body cavity searches because these searches are allowed if there is merely a "potential risk" or "reasonable possibility" that the admittee possesses contraband or an item restricted by the treatment team, but does not require a finding of probable cause or a judicial warrant. Compl. ¶¶ 88–105. Plaintiffs also allege that the CDPC policy violates the ADA and Rehabilitation Act. Compl. ¶¶ 120–127.

Inasmuch as CDPC's search policy is repeatedly referenced in the complaint and integral to a determination of the instant motion, pertinent portions of that policy are recited here. *See Yak v. Bank Brussels Lambert,* 252 F.3d 127, 130 (2d Cir. 2001)(On a motion to dismiss, the court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference.") (citation omitted).

Regarding the decision to institute a search, the policy provides as follows:

It is recognized that CDPC staff have responsibility for making clinical deci-

sions in accordance with their expertise and delegated responsibility. *The decision to search a patient is authorized when the basis for this decision is clinical. Staff shall at all times attempt to balance issues concerning the clinical appropriateness or necessity of action vs. legal aspects of patients' rights.* However, the most important consideration is the ability to provide services in a safe and secure environment.

*The decision to search a patient . . . is based upon a determination that there exists potential risk and/or reasonable possibility that the patient possesses an item* restricted by his or her treatment team, an item considered to be contraband by local, state, or federal law, or an item that is stolen.

Search Policy, part II, p. 1 (emphasis added).

The policy is divided in to "emergency" and "non-emergency" situations and indicates that the "senior clinical staff member on duty" shall make the determination whether an emergency situation exists. Assuming one does, the senior clinical staff member on duty shall be responsible: "for taking appropriate action to insure the safety of other patients;" for making a decision regarding the ability of "program staff to handle the situation without assistance" from the Safety Office; and for making decisions "concerning the level and degree of search as well as the appropriate place to conduct the search." Search Policy, p. 3, ¶ 1. In conducting a search in an emergency situation, the staff is to inform the patient of the reason for conducting the search and seek the patient's permis-

---

**2.** With regard to deviations from the search policy, the complaint alleges that Aiken's strip search was conducted in a public rest room and in a manner that was degrading, humiliating, and unreasonable. Compl. ¶¶ 51–57. Further, the complaint alleges that the staff never sought Aiken's permission for the search, never notified him of the reason for the search, never received authorization for the search from the program director, had no probable cause for the search, and the search was not conducted under the supervision of a physician or resident physician. Compl. ¶¶ 65–75.

sion if possible. *Id.,* p. 3, ¶ 2. The staff must also insure that two staff members are present with at least one being of the same sex as the person being searched with the "staff member of the same sex . . . responsible for conducting the actual search." *Id.,* p. 3, ¶ 2.

Searches in non-emergency situations proceed in essentially the same fashion with the exception that the non-emergency search needs to be authorized by the "Program Director or designee." *Id.,* p. 4, ¶¶ 1–3. The policy applies to individuals being screened by the Crisis Intervention Program and, in accordance with the policy, the Crisis staff has initiate guidelines for searches of these patients. These guidelines do not deviate in material respect from the general policy.

The policy delineates that "the typical and routine search" for both emergency and non-emergency situations involves having a patient empty his or her pockets and packages, with staff then examining the patient's clothing to "ensure noting is concealed within the clothing." Search Policy, p. 3, ¶ 4(a). The policy further provides that "[o]n occasion, based on clinical judgment, a patient will be asked to submit to a metal detector search" to be conducted by a Safety Officer. *Id.* at ¶ 4(b).

Still further, the policy provides that:

*[o]n rare occasion, based on clinical judgement,* a patient will be asked to submit to a body search and to disrobe down to their undergarments for the search. The Program Director, or Administrator on Call after hours, must give permission for a strip search. *Upon reasonable belief and to prevent serious harm to themselves,* a body cavi-

ty search may be instituted with the permission of the Program Director, Administrator on Call after hours. *Strip searches and body cavity searches may only be conducted by or under the supervision of a physician (resident physician after hours).* The presence of at least one same sex staff member during a strip or body cavity search is essential. *Id.* ¶ 4(c)(emphasis added).

The policy indicates that "items obtained in a search that were confiscated because they are restricted by the patient's treatment team should be held by the facility until such time as the patient is discharged . . . ." *Id.,* p. 2, § III(A). "Items that are confiscated because they are contraband . . . and items that are stolen, but their ownership cannot be determined, shall be turned into the Safety Office." *Id.* The complaint alleges that the Safety Officers are peace officers under New York Law and, therefore, this provision of the policy "permits searches for law enforcement purposes." Compl. ¶ 98. However, there is no allegation of any criminal prosecution arising from any search conducted in accordance with this policy.

Finally, the search policy is made applicable to visitors to CDPC when "the Program Director or designee has decided that it is appropriate to search a visitor in order to maintain a safe and secure environment . . . ." *Id.* p. 5.

### C. Relief Sought

Plaintiffs Disability Advocates, Inc. and Aiken seek injunctive and declaratory relief against the defendants [3] under § 1983 to halt illegal searches of patients at CDPC which violate the Fourth and Fourteenth Amendments, and against CDPC to enjoin searches in violation of Title II of

---

**3.** Injunctive relief is sought against all defendants except defendant Cavanaugh, who no longer works at CDPC.

the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. In addition, Aiken seeks monetary damages pursuant to § 1983, the ADA, and Section 504 for damages arising from the January 19, 2000 search.

## III. DISCUSSION

### A. *Rule 12(b)(6) -Standard*

On a Rule 12(b)(6) motion, a court must assume that the allegations in the complaint are true and draw all reasonable inferences in the plaintiffs' favor. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); *Kaluczky v. City of White Plains,* 57 F.3d 202, 206 (2d Cir. 1995). Dismissal is "appropriate only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Harris v. City of New York,* 186 F.3d 243, 250 (2d Cir.1999)(quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). A court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985). However, a plaintiff cannot oppose a motion to dismiss through assertions of facts not reflected in the complaint, *see Wright v. Ernst & Young LLP,* 152 F.3d 169, 178 (2d Cir.1998)(citing *IIT v. Cornfeld,* 619 F.2d 909, 914 n. 6 (2d Cir.1980)), or defeat a motion to dismiss with conclusory allegations, unwarranted speculation, unsupported deductions, or legal arguments cast as factual pleadings. *See Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1088 (2d Cir.1995).

### B. *Standing to Raise Claims for Injunctive & Declaratory Relief*

 The Court will first address defendants' challenge to plaintiffs' standing to raise the claims for injunctive and declaratory relief. "The party invoking federal jurisdiction bears the burden of establishing the elements of standing." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). A plaintiff must separately demonstrate standing for each form of relief sought including claims for injunctive relief and a declaratory judgment. *Friends of Earth v. Laidlaw,* 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). Standing for an equitable claim must appear on the face of the complaint in order to survive a motion to dismiss. *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Clarry v. United States,* 85 F.3d 1041 (2d Cir.1996).

 As an element of standing and a prerequisite for invoking federal jurisdiction, plaintiffs must allege an actual case or controversy ripe for review. *Carpenter Technology v. Bridgeport,* 180 F.3d 93 (2d Cir.1999). In order to satisfy Article III of the United States Constitution and demonstrate an "actual case or controversy" conferring standing for injunctive or declaratory relief, a plaintiff must show:

(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Laidlaw,* 528 U.S. at 185–86, 120 S.Ct. 693 (citing *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130 and *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).

 Defendants assert that the plaintiffs lack standing to raise their claims for injunctive and declaratory relief related to

the CDPC's search policy because Aiken's injury occurred, according to his own allegations, because the officials *deviated* from the policy when they searched Aiken on January 19, 2000. *See* compl. ¶¶ 55–66,[4] 71–75, 94–100. Defendants further contend that the plaintiffs have failed to allege that anyone has ever been unlawfully searched pursuant to the state policy they now attempt to challenge. Thus, defendants assert that because the violation to Aiken's rights, if any, was caused by *the deviation* from the policy—not the policy itself, and because the deviation from the policy is not likely to re-occur, plaintiffs lack standing to pursue the claims. Thus, defendants argue that plaintiffs' claims cannot satisfy the second and third elements of the *Laidlaw* test. *See Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

The plaintiffs counter that the allegations in the complaint are made in the alternative as allowed by Rule 8 of the Federal Rules of Civil Procedure and, alternatively, that the allegations of the search being pursuant to *and* in deviation from the official policy are not mutually exclusive. Plaintiffs argue that, unlike in *Lyons*, the complaint asserts that the CDPC policy authorizes unconstitutional searches, and that the policy caused the search complained of and will therefore

likely cause unconstitutional searches in the future. *See* Compl. ¶¶ 88–105. Plaintiffs further contend that, unlike the plaintiff in *Lyons*, Aiken faces a real and immediate threat of repeated injury from the defendants' policies (and therefore is entitled to injunctive and declaratory relief, as well as damages) because Aiken's illness makes it very likely that he will need emergency mental health care at any moment, and because seeking such care necessitates his evaluation at CDPC. Comp. ¶¶ 6–8, 46, 114–15.[5]

This particular dispute centers as much on the confluence of two important fundamentals of federal practice—namely, the right to plead a case in the alternative under FED. R. CIV. P. 8 and the obligation to plead with enough sufficiency to withstand a motion to dismiss under FED. R. CIV. P. 12(b)(6)—as it does on the prudential concerns of standing. Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Swierkiewicz v. Sorema*, 534 U.S. 506, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002)(quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "This simplified notice pleading standard

---

4. *See e.g.* Compl. ¶ 65 ("Defendants failed to comply with the written Search Policy set forth in the CDPC Clinical Policy Manual"); Compl. ¶ 66 ("Defendants failed to comply with the written Search Policy set forth in the CDPC Crisis Care Program Manual."); Compl. ¶¶ 71–75 (enumerating the numerous ways in which these defendants allegedly violated the official policy).

5. The complaint asserts that: Aiken has a serious and persistent mental illness. (¶ 6); he has repeatedly been admitted to CDPC for inpatient care and treatment. (¶ 7); due to his

serious, persistent mental illness he is likely to be a patient at CDPC again. (¶ 8); he has a mental condition which requires emergency mental health care frequently, and without such care he is at great risk of harm. (¶ 46); and, CDPC plays a gatekeeper function for emergency mental health care in Albany County, where Aiken lives in that everyone in Albany County who needs evaluation for emergency medical care first goes, or is taken by the police or mental health crisis team, to the CDPC crisis services. (¶ 114).

relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Id.; see* 5 Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1215 (1990 & 2002).

Further, Rule 8(e) *"authorizes alternative and hypothetical pleading,* and *eliminates any requirement of consistency of statement,* subject to the good-faith obligation in Rule 11." 5 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1215 (emphasis added); *see also* 5 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1282 (2002)(ALTERNATIVE AND HYPOTHETICAL PLEADING)("Rule 8(e)(2) affords a party considerable flexibility in framing his pleading by expressly permitting him to set forth his claims or defenses in an alternative or hypothetical manner."). Thus, alternative and even contradictory allegations may be plead in a complaint.

Assuming the truth of the allegations in the complaint, a finder of fact could conclude that the search occurred *because of* the existing policy, *see* compl. ¶ 104, and, as plaintiffs seem to assert, that the contravention of policy caused an even more egregious injury. Indeed, it is possible that the "standing order" to search Aiken drew its authority from the official search policy and therefore a finder of fact could conclude that the policy itself put into motion the series of events which culminated on January 19, 2000. Plaintiffs may be able to establish that the official policy was the cause of the search even though the defendants who actually conducted the search failed to comply with all of the requirements of the policy. *See Deshawn E. v. Safir,* 156 F.3d 340, 344 (2d Cir.1998).

Here, the allegation that Aiken was searched in violation of his constitutional rights is sufficient to satisfy the injury-in-fact element for standing. *Lerman v. Board of Elections,* 232 F.3d 135, 142 (2d Cir.2000).[6] Further, the injury is fairly traceable to the challenged policy. Thus, the connection to the official policy is, at this stage, sufficient to establish the necessary causation linking the policy to the injury.

■ Finally, the relief sought, if granted, would likely redress future violations which are, in these circumstances, likely to reoccur. "It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." *Lyons,* 461 U.S. at 98, 107 n. 8, 103 S.Ct. 1660 (emphasis in original). Threat of a repeated injury is, at least for Aiken, a reality. Unlike the plaintiff in *Lyons,* based upon the allegations in the complaint Aiken faces a real and immediate threat of repeated injury from the defendants' policy. Given Aiken's allegations of his persistent mental health condition, the contention that CDPC is the only crisis mental health unit in the locale of plaintiff's residence, and the allegation that he was already singled out to be searched in accordance with the policy, the Court cannot say as a matter of law that it appears beyond doubt that he can prove no set of facts in support of his claim which would entitle him to equitable relief.

---

**6.** The Second Circuit has directed that on a Rule 12(b)(6) motion, the determination of whether Article III standing exists must comport with the manner and degree of evidence required at that stage of the litigation. *Lerman,* 232 F.3d at 142. All facts averred by the plaintiffs must be taken as true for purposes of the standing inquiry, and, given further the obligation to draw all favorable inferences in the pleader's favor, general factual allegations of injury resulting from the challenged conduct may suffice to support the existence of standing. *Id.* (citations omitted).

Therefore, the Court finds that Aiken has standing to assert the claim for injunctive and declaratory relief. *See Risinger v. Concannon,* 117 F.Supp.2d 61, 70 (D.Maine 2000)(allegation that mental patient was injured by the operation of an official policy was sufficient to establish Article III standing to obtain injunctive relief).

### 4. Associational standing

■ DAI is an "authorized protection and advocacy agency under the Protection and Advocacy for Individuals with Mental Illness Amendment Act of 1991, 42 U.S.C. § 10801." Compl. ¶ 10. 42 U.S.C. § 10805 authorizes such an organization to bring suit on behalf of its members if it can meet the traditional test of associational standing and sufficiently allege and adequately plead that one of its constituents has suffered an actual concrete injury that would allow it to bring suit in its own right. *Doe v. Stincer,* 175 F.3d 879, 885–87 (11th Cir.1999); *see also, Pennsylvania Protection and Advocacy Inc. v. Houston,* 136 F.Supp.2d 353 (E.D.Pa.2001), *Risinger,* 117 F.Supp.2d 61.

■ "An association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). In light of the fact that the Court has concluded that Aiken has standing to bring his individual claim, there are also sufficient allegations to find that DAI has associational standing to bring the same claims on behalf of its constituents. *See* 18 U.S.C. § 10805;

*M.O.C.H.A. Society Inc. v. City of Buffalo,* 199 F.Supp.2d 40, 46–50 (W.D.N.Y.2002). Thus, that much of the motion to dismiss the injunctive and declaratory claims for lack of standing is denied.

### C. *Pullman Abstention*

■ In the Reply brief, defendants argue that the Court should abstain from adjudicating this matter to allow the state court to interpret the search policy. Plaintiffs contend that the defendants are arguing for *Pullman* abstention which is inapplicable here. The Court agrees with the plaintiffs on this point.

■ In *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), the Supreme Court counseled federal courts to " 'abstain from decision when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided.' " *Alliance of American Insurers v. Cuomo,* 854 F.2d 591, 601 (2d Cir.1988)(quoting *Hawaii Housing Auth. v. Midkiff,* 467 U.S. 229, 236, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984)). However, abstention represents a "narrow exception" to the principle that a person with a *bona fide* federal claim is entitled to adjudication in a federal court, *see McRedmond v. Wilson,* 533 F.2d 757 (2d Cir.1976), and is only appropriate in rare cases and "not simply to give state courts the first opportunity to vindicate [a] federal claim." *Zwickler v. Koota,* 389 U.S. 241, 251, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967)(citing *McNeese v. Board of Education,* 373 U.S. 668, 673, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963)). "[T]here is little or no discretion to abstain in a case which does not meet traditional abstention requirements." *Bethphage Lutheran Serv., Inc. v. Weicker,* 965 F.2d 1239, 1244–45 (2d Cir.1992)(internal quotation marks omitted).

The Second Circuit has held that *Pullman* abstention "may be appropriate when three conditions are met: (1) an unclear state statute is at issue; (2) resolution of the federal issue depends on the interpretation of state law; (3) the law is susceptible to an interpretation by a state court that would avoid or modify the constitutional issue." *Vermont Right to Life Comm., Inc. v. Sorrell,* 221 F.3d 376, 385 (2d Cir.2000).

Here, defendants do not argue convincingly that these conditions are met. The issue to be resolved is whether the state agency's policy violates the constitutional rights of admittees into the CDPC facility, and whether the search of Aiken on January 19, 2000 violated his federally protected and constitutional rights. The Court fails to see what difficult and unsettled questions of state law must be resolved before these federal questions can be decided. Therefore, the Court declines to abstain in this matter.

### D. *ADA and § 504 Claims*

Defendants next argue that plaintiffs fail to assert viable ADA and Rehabilitation Act claims. The Court agrees.

### 1. ADA & Rehabilitation Act

"Both the Rehabilitation Act and the ADA protect disabled persons from discrimination in the provision of public services." *Cercpac v. Health & Hosps. Corp.,* 147 F.3d 165, 167 (2d Cir.1998); *see* 29 U.S.C. § 794(a); 42 U.S.C. § 12132. "Apart from the Rehabilitation Act's limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded—as opposed to 'public'—entities, these provisions purport to impose precisely the same requirements." *Cercpac,* 147 F.3d at 167. Thus, "[t]he standards for establishing a violation of Section 504 of the Rehabilitation Act and the ADA are essentially the same." *Wright v. Giuliani,* 2000 WL 777940, at *6 (S.D.N.Y. June 14, 2000)(citing *Rodriguez v. City of New York,* 197 F.3d 611, 618 (2d Cir.1999); *Doe v. Pfrommer,* 148 F.3d 73, 82 (2d Cir.1998); *Henrietta D. v. Giuliani,* 1996 WL 633382, at *6 (E.D.N.Y. Oct. 25, 1996)).

The purpose of both of these statutes is "to eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and the able-bodied." *Pfrommer,* 148 F.3d at 82 (citing *Southeastern Comm. College v. Davis,* 442 U.S. 397, 410, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979)).

### 2. Allegations in the Complaint

The complaint provides no factual basis on which a finder of fact could conclude that the disabled who seek to enter CDPC as a patient, either voluntarily or involuntarily, are treated any differently than an "able-bodied" individual who attempts the same treatment. Plaintiffs do not allege that any individual has been denied any benefit or service on the basis of a disability. Rather (as defendants point out), in their claims for injunctive relief, plaintiffs challenge a general state policy that is applicable to all who enter CDPC, and plaintiffs do not allege that this policy differentiates in its applicability based upon a disability. Plaintiffs' allegation that the CDPC policy "discriminates against qualified disabled patients, by reason of their disability, by denying their right to be free of unreasonable searches and seizures which is enjoyed by all other free persons" is nothing more than a legal argument cast as a factual pleading. This is insufficient to oppose the present motion. *See Hirsch,* 72 F.3d at 1088.

Even construing the allegations of the complaint liberally, it simply does not state the factual grounds upon which such dis-

crimination claims could be based. *See Swierkiewicz,* 122 S.Ct. at 998. The complaint fails to allege that anyone who seeks to enter CDPC as a patient—whether "disabled" or not, or "qualified" or not—is excluded from the reaches of the policy.[7] By plaintiffs' allegations, subjugation to the reaches of the policy arises as a condition of entry as a patient into the facility, not from considerations of a person's status as being disabled or not. While the application of the policy may be in violation of all admittees' constitutional rights, that is an issue which does not turn on a person's physical, mental, or psychological condition. As plaintiffs' "discrimination claims do not draw their substance from any alleged discriminatory animus against the disabled, either under a disparate treatment or disparate impact theory," plaintiffs' ADA and Rehabilitation Act claims must be dismissed. *Pfrommer,* 148 F.3d at 82; *see Cercpac,* 147 F.3d at 167.

### E. *Eleventh Amendment*

### 1. Monetary Claims

■ Defendants next argue that to the extent that plaintiffs are suing CDPC (a state agency) and the individual defendants in their official capacities for monetary damages, the suit is barred by the Eleventh Amendment. To the extent the argument is applicable to the remaining claims,[8] the Court finds that such claims for monetary damages are barred.

■ The Eleventh Amendment prohibits courts from exercising jurisdiction over lawsuits against a state seeking monetary damages unless it waives sovereign immunity or Congress has expressly and validly abrogated that immunity. *Board of Trustees of Univ. of Alabama v. Garrett,* 531 U.S. 356, 363, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); *Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999); *A.A. v. Board of Edu.,* 2002 WL 654319, at *4 (E.D.N.Y. April 18, 2002). "Lawsuits against state officials in their official capacities are not lawsuits against these individuals but, rather, are lawsuits against the official's office." *A.A. v. Board of Edu.,* 2002 WL 654319, at *4. As such, they are "no different from a suit against the State itself." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

"It has long been held that Section 1983 does not allow a State to be called into Federal Court to answer in damages for the alleged deprivation of a federal right." *A.A. v. Board of Edu.,* 2002 WL 654319, at *6 (citing *Will,* 491 U.S. at 65, 109 S.Ct. 2304). Inasmuch as New York has not waived its immunity from a Section 1983 damages award, that much of the case brought against the State for monetary damages is barred by the Eleventh Amendment. *See Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 100–01, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Jones v. New York State Div. Of Military & Naval Affairs,* 166 F.3d 45, 49 (2d Cir.1999); *Kostok v. Thomas,* 105 F.3d 65, 68 (2d Cir.1997); *Trotman v. Palisades Interstate Park Commission,* 557 F.2d 35, 39 (2d Cir.1977); *Baird v. New York State Exec. Department,* 1998 WL 690951 * 2 (N.D.N.Y. Sept. 28, 1998).

■ Further, "[j]ust as the Eleventh Amendment bars claims for relief under

---

7. In fact, the policy itself indicates that it is applicable to visitors who, the Court must presume, are not necessarily disabled.

8. Inasmuch as the ADA and Rehabilitation Act claims are dismissed, the Court does not embark on an analysis of the viability of such claims under the Second Circuit's recent holding in *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn,* 280 F.3d 98 (2d Cir.2001).

federal law, it acts as a bar to state law claims brought against a state in federal court." *A.A. v. Board of Edu.,* 2002 WL 654319, at *6 (citing *Winokur v. Office of Court Administration,* 190 F.Supp.2d 444, 450–51 (E.D.N.Y.2002)). Therefore, all claims for monetary damages against CDPC and the individual defendants in their official capacities are dismissed.

## 2. Equitable Relief

■ Defendants also argue that "absent credible allegations of an ongoing constitutional violation as a direct result of state policy, plaintiffs' suit [seeking equitable relief] is barred by the Eleventh Amendment." In this regard, defendants again contend that because plaintiffs affirmatively aver that the individuals who searched Aiken were acting contrary to an official state policy, plaintiffs fail to allege facts demonstrating that a state policy is in direct conflict with any federal law warranting a federal court's interference with the daily operations of a state agency.

■ While it is true that, in general, the Eleventh Amendment serves as a jurisdictional bar to suits against a state agency regardless of the nature of the relief sought, including suits in equity, *Pennhurst,* 465 U.S. at 100, 104 S.Ct. 900; *Green v. Mansour,* 474 U.S. 64, 72–73, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985); *See also Komlosi v. New York State Office of Mental Retardation and Developmental Disabilities,* 64 F.3d 810 (2d Cir. 1995)(OMRDD is an arm of the state and is immune under the Eleventh Amendment), a narrow exception to this principle allows a federal court to issue an injunction against a state official in his or her official capacity who is acting contrary to federal law. *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *see Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 102, 104 S.Ct. 900, 79

L.Ed.2d 67 (1984); *New York Health and Hospitals Corporation et al. v. Perales,* 50 F.3d 129 (2d Cir.1995). This exception is a limited one, utilized only "when there is a specific conflict between the federal mandate and the state plan or practice that a federal right is implicated," *Pfrommer,* 148 F.3d at 80–81, and is authorized to "vindicate the supremacy of [federal] law." *Ward v. Thomas,* 207 F.3d 114, 119 (2d Cir.2000).

The Supreme Court has held that "[i]n determining whether the doctrine of *Ex Parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Maryland Inc. v. Public Serv. Comm. Of Maryland,* 535 U.S. 635, ——, 122 S.Ct. 1753, 1760, 152 L.Ed.2d 871 (2002)(quoting *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 296, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997))(O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment). The inquiry "does not include an analysis of the merits of the claim." *Id.* at 1761.

Here, inasmuch as plaintiffs' minimally allege that CDPC's search policy caused Aiken's search, *see* compl. ¶ 104, and imposes a potential violation to all future admittees' constitutional rights if applied as it was to Aiken, the complaint states sufficient facts to allow the claims for injunctive and declaratory relief to go forward under the exception enunciated in Ex Parte Young. The prayer for injunctive relief is clearly prospective in nature and therefore falls under the *Ex Parte Young* exception. The prayer for declaratory relief, inasmuch as it seeks a declaration for past wrongs, does not seek to impose a monetary loss upon the state for past conduct. Therefore, "[i]nsofar as the expo-

sure of the State is concerned, the prayer for declaratory relief adds nothing to the prayer for injunction." *Verizon Maryland Inc.*, 535 U.S. at ——, 122 S.Ct. at 1760. Consequently, the motion is denied on this ground.

### F. *Personal Involvement of Defendants Nixon, Glebba, Di Blasio, and Cavanaugh*

Defendants next contend that plaintiffs have failed to allege sufficient personal involvement on the part of defendants Nixon, Cavanaugh, Di Blasio, and Glebba in any alleged constitutional violation to make out a viable Section 1983 claim against them. Plaintiffs counter that Defendant Cavanaugh's "standing order" caused Aiken to be searched without probable cause, *see* compl. ¶¶ 37, 51, 108; that Defendant Nixon promulgated a search policy that authorizes unconstitutional searches, compl. ¶¶ 93—104; and that defendants Nixon, Glebba and Di Blasio have supervisory liability for Aiken's unconstitutional search because they failed to train CDPC staff in constitutionally proper search techniques. Compl. ¶¶ 81–87.

### 1. Supervisory Liability—Standard

To establish personal liability against a government official for a constitutional violation, a plaintiff must show that "the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Thus, it is axiomatic that "[p]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995).

"Personal involvement" of a supervisory official may be established by evidence of: (1) direct participation in the alleged constitutional violation; (2) failure to remedy a wrong after learning of it; (3) creation or maintenance of a policy under which unconstitutional violations occurred; (4) gross negligence in managing subordinates who committed the unconstitutional acts; or (5) *deliberate indifference by failing to act on information indicating that constitutional violations were occurring. Colon*, 58 F.3d at 873.

### 2. Supervisory Liability—Cavanaugh

Inasmuch as the Court must accept as true the allegations contained in the complaint on this Rule 12(b)(6) motion, the Court finds that plaintiffs have stated sufficient personal involvement regarding Cavanaugh based upon her placing a standing order on Aiken's file. This order supposedly required that Aiken be searched each time he enters the facility. The conduct alleged, if true, constitutes direct participation in the alleged constitutional tort[9] and satisfies the first ground stated in *Colon*, 58 F.3d at 873. Thus, the motion in this regard is denied.

---

**9.** A genuine question of material fact exists as to whether the acts of Defendant Bellinger–Alleman and the employees who conducted the search (DeSeve, Harper, and Monte) constituted an intervening event breaking the chain of causation back to Cavanaugh's standing order (as the defendant asserts). At this stage, it is unknown precisely what the "standing order" stated or even whether the persons who conducted the search read the order so the Court cannot resolve the inherently factual issue of whether the standing order set into motion the January 19, 2000 search. Inasmuch as the Court's function is to determine only whether issues exists upon which plaintiffs *might* prevail, the Court must conclude that plaintiffs might present facts establishing this causal connection exits.

### 3. Supervisory Liability—Nixon (promulgated policy)

 There is also sufficient personal involvement regarding defendant Nixon to satisfy the third ground stated in *Colon,* 58 F.3d at 873. The complaint alleges that Nixon promulgated the strip search policy in issue here, and this is sufficient to establish his personal involvement through a theory of supervisory liability. *Id.*

### 4. Supervisory Liability—Nixon, Glebba and Di Blasio

 Finally, the allegations of Nixon, Glebba and Di Blasio's personal involvement under a "failure to train" theory, while slim, are sufficient at this stage to withstand the motion. In this regard, the complaint alleges that "Defendants Nixon, Di Blasio and Glebba had a duty to train CDPC staff," compl. ¶ 84, but "failed to provide such training," compl. ¶ 85, thereby "set[ting] in motion a series of acts by [the other individual defendants] which they knew or reasonably should have known, would cause [the other individual defendants] to inflict constitutional injury to patients such as Aiken." Compl. ¶ 86. While the complaint does not use the terminology of gross negligence or deliberate indifference, the allegations put the defendants on notice of the nature of the claim. Implicit in these allegations is the contention that these three defendants had supervisory control over the actors who actually performed the search, yet knowingly failed to prevent a constitutional violation through proper training, and therefore satisfies the fourth and fifth grounds stated in *Colon,* 58 F.3d at 873. Whether these three defendants did, in fact, have supervisory control over the actors who conducted the search cannot be resolved on this motion. There are sufficient allegation of each of their personal involvement under a supervisory liability theory to withstand the instant motion, and, consequently, it is denied on this ground.

### G. Defendants Cavanaugh, Nixon, Glebba, and Di Blasio–Qualified Immunity

Defendants Nixon, Cavanaugh, Di Blasio, and Glebba also contend that they are entitled to qualified immunity because the right allegedly violated was not clearly established at the time of the alleged constitutional violation.

### 1. Qualified Immunity—General

 Qualified immunity is available only to defendants in their individual capacities and only on that much of the claims seeking monetary damages. *Lewis v. Cowen,* 165 F.3d 154, 166 (2d Cir.1999); *see, e.g., Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). The defense "serves important interests in our political system," *Sound Aircraft Servs., Inc. v. Town of East Hampton,* 192 F.3d 329, 334 (2d Cir.1999), ensuring that damages suits do not "unduly inhibit officials in the discharge of their duties" by burdening individual officers with "personal monetary liability and harassing litigation." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *see Connell v. Signoracci,* 153 F.3d 74, 79 (2d Cir.1998). For this reason, the Supreme Court has directed that "[w]here the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2155–56, 150 L.Ed.2d 272 (2001).

 In analyzing a claim of qualified immunity, the Court must go through the proper sequence of inquiries. *Saucier,* 121

S.Ct. at 2155. First, the Court must determine "whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, —— U.S. ——, 122 S.Ct. 2508, 2513, 153 L.Ed.2d 666 (2002)(citing *Saucier*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272). Only if that inquiry is in plaintiffs' favor does the Court proceed to the next step, which is to determine whether each defendant's actions "violate[d] 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *but see Koch v. Town of Brattleboro*, 287 F.3d 162, 166 (2d Cir.2002).[10]

Thus, the Court must first address the central issue of this case, that is, whether the facts alleged and taken in the light most favorable to the plaintiffs could establish a violation of the Fourth Amendment.[11] Only after that is done can the Court address the question of whether *that right* was clearly established at the time.

**2. Fourth Amendment**

■■■ "[T]he Fourth Amendment vests individuals with the right to be free from 'unreasonable government intrusions into their legitimate expectations of privacy.'" *Chandler v. Miller*, 520 U.S. 305, 117 S.Ct. 1295, 1298, 137 L.Ed.2d 513 (1997)(quoting *United States v. Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977)); *see*

also *Bell v. Wolfish*, 441 U.S. 520, 558, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Because CDPC is a state hospital, the members of its staff are government actors subject to the strictures of the Fourth Amendment. *Ferguson v. City of Charleston*, 532 U.S. 67, 121 S.Ct. 1281, 1287, 149 L.Ed.2d 205 (2001). However, "[t]o hold that the Fourth Amendment applies to searches conducted by [state actors] is only to begin the inquiry into the standards governing such searches." *New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).

■■■ In order to further "[t]he purpose of the fourth amendment [which] is to protect people from arbitrary and oppressive governmental conduct," *Sec. and Law Enforcement Employees v. Carey*, 737 F.2d 187, 201 (2d Cir.1984)(citing *Michigan v. Tyler*, 436 U.S. 499, 504, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978); *Chadwick*, 433 U.S. at 7, 97 S.Ct. 2476), a warrant issued on probable cause by a neutral magistrate is generally required to conduct a search of a person's body. *See Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). Nonetheless, government officials do not need a warrant or probable cause to conduct a search "when 'special needs, beyond the normal need for law enforcement, make the warrant and proba-

---

10. In *Koch*, the Second Circuit stated that "[a]lthough we normally apply this two-step test, where we are convinced that the purported constitutional right violated is not 'clearly established,' we retain the discretion to refrain from determining whether, under the first step of the test, a constitutional right was violated at all." 287 F.3d at 166.

11. Plaintiffs' complaint casts the constitutional violation as flowing from both the Fourth and Fourteenth Amendments. Plaintiffs ar-

gue that a Fourth Amendment analysis applies, and therefore the Court proceeds under that Amendment. *See County of Sacramento v. Lewis*, 523 U.S. 833, 843, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[I]f a constitutional claim is covered by a specific constitutional provision ... the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.") (internal quotation marks omitted).

ble-cause requirement impracticable.'" *Griffin v. Wisconsin,* 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)(quoting *New Jersey v. T.L.O.,* 469 U.S. 325, 351, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)(Blackmun, J., concurring)); *see also Chandler,* 117 S.Ct. at 1301; *Skinner v. Railway Labor Executives' Assn.,* 489 U.S. 602, 109 S.Ct. 1402, 1417, 103 L.Ed.2d 639 (1989). In a "special needs" case, a warrantless search is allowed provided it is "divorced from the State's general interest in law enforcement," *Ferguson v. City of Charleston,* 532 U.S. 67, 79, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001), and reasonable under the circumstances. *Roe v. Texas Dep't of Protective and Regulatory Servs.,* 299 F.3d 395, 404 (5th Cir.2002)(In such special needs cases, "the [Supreme] Court judge[s] the search's lawfulness not by 'probable cause' or 'reasonable suspicion' but by 'the standard of reasonableness under all of the circumstances.'")(quoting *O'Connor v. Ortega,* 480 U.S. 709, 725–26, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987)); *see also Illinois v. McArthur,* 531 U.S. 326, 121 S.Ct. 946, 948, 148 L.Ed.2d 838 (2001)(Fourth Amendment's "'central requirement' is one of reasonableness.").

▮ Here, there is no overt indication of any entanglement with law enforcement arising from the searches. While the complaint alleges that the Safety Officers are peace officers able to institute criminal prosecution, there is no indication of any criminal prosecution arising from the searches or other indica indicating that the searches serve the State's general interest in law enforcement. Further, the policy has as both its stated and apparent purposes the goal of protecting the welfare of the patients and staff at the psychiatric

hospital. Therefore, this appears to be a special needs case and, consequently the Court turns to the reasonableness test to determine whether a violation of the Fourth Amendment is made out.

### 3. The Fourth Amendment's Reasonableness Requirement

▮ Of course, "what is reasonable depends on the context within which a search takes place." *New Jersey v. T.L.O.,* 469 U.S. at 337, 105 S.Ct. 733. "In determining the reasonableness of a search, the intrusion on an individual's privacy interests is balanced against the search's 'promotion of legitimate governmental interests.'" *United States v. Colon,* 250 F.3d 130, 134 (2d Cir.2001)(quoting *Maryland v. Buie,* 494 U.S. 325, 331, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990)); *see also National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 665–66, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989).[12]

The reasonableness test has been viewed as a two pronged analysis. *See Carey,* 737 F.2d at 201. On the first prong, the reasonableness of the intrusion on the individual's Fourth Amendment interest is viewed by comparing the individual's legitimate expectation of privacy with the intrusiveness of the search. *Id.; see Anobile v. Pelligrino,* 284 F.3d 104, 117 (2d Cir.2002) ("Unreasonableness is gauged in part by the degree of expectation of privacy and the intrusiveness of the search."). In some circumstances, one type of search may be reasonable while another, more intrusive search, may not. *See Carey,* 737 F.2d at 201 (holding that strip searches but not visual body cavity searches of prison guards reasonable without a warrant).

---

**12.** In *Von Raab,* the Court held that when such special governmental needs were present "it is necessary to balance the individual's privacy expectations against the Govern-

ment's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." 489 U.S. at 665–66, 109 S.Ct. 1384

On the second prong, the legitimate governmental interests which the search seeks to promote is viewed for reasonableness within the context of the intrusion on the fundamental right to privacy. *Sec. and Law Enforcement Employees v. Carey*, 737 F.2d at 201; *see Skinner*, 489 U.S. at 621, 109 S.Ct. 1402. (The Court must ultimately assess whether the asserted government interest "justifies the privacy intrusions at issue absent a warrant or individualized suspicion.")

The test, overall, is not capable of precise definition and depends upon many case-specific factors. *Bell*, 441 U.S. at 559, 99 S.Ct. 1861. Here, the analysis weighs the governmental interest in curtailing the introduction of drugs and other contraband into a crisis psychiatric facility against the invasion of personal rights that the searches entail, taking into account the legitimate expectations of privacy of persons entering the psychiatric facility, the invasion of personal rights that the searches entail, the manner in which they are conducted, the justification for initiating them, and the place in which they are conducted. *Id.*

### 4. The Fourth Amendment's Requirement Here

#### a. Expectation of Privacy

Addressing first the legitimate subjective expectation of privacy of voluntary admittees into a crisis psychiatric ward, the Court finds that the expectation, while certainly not *de minimis*, is diminished below that of the public in society generally. The admittees, whether having been to such a unit in the past or not, must necessarily expect that they cannot bring illegal substances or weapons into the facility. Further, they must necessarily expect (and indeed, in the case of a voluntary admissions such as Aiken's, request) that they will be subjected to an array of medical procedures which necessarily involve invasions of bodily and personal integrity.

This diminished expectation of privacy of these admittees is what society is prepared to recognize as reasonable given the societal interest in protecting the health, safety, and welfare of the patients and staff of these units who would be detrimentally affected without sufficient precautionary measures. *See Jennings v. New York State Off. of Mental Health*, 786 F.Supp. 376, 382 & 384 (S.D.N.Y.1992),[13]

---

13. In *dicta* in *Jennings*, District Judge Goettel stated:

> Another [Security Hospital Treatment Assistant ("SHTA")] duty which potentially implicates patient privacy is frisks. It appears that frisks are performed routinely at [Mid-Hudson Psychiatric Center ("MHPC")]. In general, a frisk, which is performed by an SHTA either upon the patient's admission to the facility or on the orders of a physician, is limited to the arms and legs and an examination of the contents of the patient's pockets which the patient has emptied. **In addition, a patient can be strip searched.** These are conducted by a physician although in the presence of the SHTA who provides security. It is hospital policy to have an SHTA of the same **gender perform all body searches no matter how invasive although we do not agree that the limited**

> **frisk violates the patients' privacy in any manner.**

*Jennings*, 786 F.Supp. at 382 (emphasis added).

In another part of this same decision, District Judge Goettel wrote:

> The patients at [MHPC] are not convicted criminals but instead are there as a result of civil commitments. Thus, their right to privacy may not be abrogated by virtue of their confinement in a state-run facility unlike a prison inmate who has forfeited some rights in repayment to society. The patients at [MHPC] are just that, patients. They are vulnerable and mentally ill. **Basic decency demands that their privacy be respected to whatever degree feasible.** In addition, in this Circuit, even prison inmates are accorded some degree of privacy.

*Id.* at 384.

*aff'd,* 977 F.2d 731 (2d Cir.1992). This is not to say that the searches in issue here, which entail significant invasions of personal dignity and privacy,[14] are not without implications on the plaintiffs' Fourth Amendment rights. The admittees do not check their constitutional rights at the door. Rather, the plaintiffs enjoy a legitimate, albeit diminished, expectation that they will be free from unwarranted and unreasonable governmental intrusion into their bodily privacy.

### b. Governmental Interest

Turning to the second prong, the Court finds that the Government has a legitimate and significant interest in curbing the infiltration of drugs and weapons into the psy-chiatric units. This interest is no less important than the Government's interest in preventing contraband into a prison which the Second Circuit and other courts have found justified warrantless strip searches of prison guards and prison visitors suspected of smuggling contraband into these facilities. These cases (with the limited exception articulated in *Carey* and which is discussed at fn. 15, *infra*) have found that, when balancing the diminished expectation of privacy of these individuals against the legitimate penological interest of the Government, a reasonable suspicion standard controls both strip searches and body cavity searches. *See Sec. and Law Enforcement Employees v. Carey,* 737 F.2d at 201;[15] *Varrone v. Bilotti,* 123 F.3d

---

**14.** In his dissent in *Bell v. Wolfish,* 441 U.S. 520, 594, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (Stevens, J., dissenting), Justice Stevens described body cavity searches as "clearly the greatest personal indignity."

**15.** The *Carey* Court concluded that given the competing interests at stake, "warrantless strip searches of correction officers within correctional facilities are not *per se* violative of the fourth and fourteenth amendments of the Constitution," *Sec. and Law Enforcement Employees v. Carey,* 737 F.2d at 203, and thus concluded that "strip searches of correction officers, under certain circumstances, may be reasonable in the absence of warrants issued on the basis of probable cause." *Id.* The Court further determined that, when balancing the diminished expectation of privacy against the legitimate governmental interest at stake, "a reasonable suspicion standard should govern strip searches of correction officers working in correctional facilities." *Id.* at 204.

On the issue of visual body cavity searches, however, the *Carey* Court held such searches present a much greater affront to personal dignity and privacy than do strip searches and serve a "severely diminished" governmental interest. *Id.* at 207–08. The Court concluded that given the balance of interests, visual body cavity searches required a warrant from a judicial officer based upon probable cause. *Id.* at 208.

This differentiation between the levels of suspicion for strip searches and for visual body cavity searches, however, appears to have been somewhat minimized two years later in the case of *Weber v. Dell,* 804 F.2d 796 (2d Cir.1986), *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987). In *Weber,* the Second Circuit analyzed the reasonableness of strip searches and visual body cavity searches of pretrial detainees together, holding that:

> [T]he Fourth Amendment precludes prison officials from performing strip/body cavity searches of arrestees charged with misdemeanors or other minor offenses *unless the officials have a reasonable suspicion* that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest.

*Id.* at 802 (emphasis added). The nearly similar treatment of these two types of searches has been followed by the Second Circuit since *Weber* with regard to pretrial detainees, at least inasmuch as the body cavity searches are visual and "non-intrusive." *See Shain v. Ellison,* 273 F.3d 56, 59 (2d Cir.2001). The Circuit's decision in *Shain* begins as follows:

> This appeal requires us to determine whether it was clearly established in July 1995 that corrections officers in a local correctional facility could not perform *a strip search including a non-intrusive examination of body cavities* on an individual ar-

75, 78 (2d Cir.1997)("The district court here correctly stated that at the time of the strip search ... a search of prison visitors without reasonable suspicion violated clearly established law."); *Wood v. Clemons,* 89 F.3d 922, 928 (1st Cir.1996)("reasonable suspicion" is the benchmark for prison-visitor searches);[16] *Romo v. Champion,* 46 F.3d 1013; 1019–20 (10th Cir.1995)(strip search of prison visitor constitutional), *cert. denied,* 516 U.S. 947, 116 S.Ct. 387, 133 L.Ed.2d 309 (1995); *Spear v. Sowders,* 33 F.3d 576, 580–82 (6th Cir.1994)("reasonable suspicion" standard applies to officials performing visual and manual body cavity searches of persons visiting inmates.); *Cochrane v. Quattrocchi,* 949 F.2d 11, 12–13 (1st Cir.1991)(prison visitor strip searched), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *Daugherty v. Campbell,* 935 F.2d 780, 782 (6th Cir.1991)(officials performed visual body cavity search), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992); *Thorne v. Jones,* 765 F.2d 1270, 1271 (5th Cir.1985)(prison visitor strip searched), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 313 (1986); *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir. 1982)("[T]he Constitution mandates that a reasonable suspicion standard govern strip searches of visitors to penal institutions.").

By the very nature of the services provided here, the Government is dealing with individuals who may present an array of psychological difficulties which will only be exacerbated by illicit substances (the ingestion of which will, in turn, defeat the purposes of the sought-after treatment); who may be especially vulnerable to abuse of these substances; and who may become a safety threat to themselves, other patients, and staff alike if such substances are ingested.. Further, the danger arising from the possession of a weapon by a person seeking psychiatric care is self-evident. Thus, the Government has a significant interest in curtailing the smuggling of drugs and weapons into the facility.

However, the policy allows the Government to search for stolen property. The governmental interest in discovering this material (unless the stolen property is drugs or a weapon of some sort) does not rise to the level associated with the discovery of drugs and weapons and does not sufficiently override even the diminished expectation of privacy justifying a strip or body cavity search without a warrant.

**c. Conclusion**

The Court finds that given the competing interests, the complained of searches may be reasonable under the Fourth Amendment depending upon the basis for the search, the level of suspicion, and other considerations of reasonableness as addressed above, including the manner and place that the search is conducted. However, questions of fact exist as to whether an articulable suspicion existed for Aiken's search. Further, assuming that it did, questions of fact exist as to the reasonableness of scope of the particular intrusion to which Aiken was subjected, the manner in

---

raigned on misdemeanor charges unless the officers had reasonable suspicion that the individual possessed contraband or weapons. We hold that after this court's decisions in *Wachtler v. County of Herkimer,* 35 F.3d 77 (2d Cir.1994), *Walsh v. Franco,* 849 F.2d 66 (2d Cir.1988), and *Weber v. Dell,* 804 F.2d 796 (2d Cir.1986), *no law enforcement officer reasonably could have believed that it was permissible to perform such a* *search absent individualized reasonable suspicion.*
273 F.3d at 59 (emphasis added).

**16.** In *Woods,* the First Circuit used the term "strip search" but the factual recitation of the search indicates that a visual body cavity search was performed of the searchees. 89 F.3d at 926.

which it was conducted, the justification for initiating it, and the place in which it was conducted.

Still further, it is unclear whether any search allowed under the policy would follow the protocols (or lack thereof) employed in Aiken's search. Finally, a strip search or body cavity search without a warrant for purpose of discovering stolen property which does not pose a risk of harm to the patient or others would not be constitutionally permissible.

Therefore, the Court concludes that a constitutional violation could be made out under the policy. Given the allegations of the complaint asserting that Aiken's search was conducted without probable cause and in a manner, scope and place which would appear to be unreasonable on the stated facts, and the possibility that this conduct was occasioned by the policy, plaintiffs could establish a constitutional tort. This is sufficient to allow the Court to proceed to the second phase of the qualified immunity inquiry.

### 5. Clearly established

Next, the Court must "determine whether the right in question was clearly established at the time the violation occurred, that is, whether 'it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'" *Poe v. Leonard*, 282 F.3d at 132 (quoting *Saucier*, 121 S.Ct. at 2156).

Determining first whether the right was clearly established requires an inquiry "undertaken in light of the specific context of the case, not as a broad general proposition...." *Saucier*, 121 S.Ct. at 2156. In this regard, the Supreme Court has again instructed that:

[f]or a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

*Hope*, —— U.S. at ——, 122 S.Ct. at 2515 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)(internal citation omitted)).

The qualified immunity question for these defendants is not simply whether the Fourth Amendment protects citizens from strip searches and body cavity searches without a reasonable suspicion to believe that the person being searched possessed a weapon or contraband, but rather whether a reasonable state official working in a psychiatric center would know that what the defendant is accused of doing was unlawful. Three factors generally determine whether a right is clearly established: (1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. *Shechter v. Comptroller of City of New York*, 79 F.3d 265, 271 (2d Cir.1996).

Here, there are no cases from the Supreme Court or the circuit courts directly on point.[17] The issue is novel, at least

---

**17.** Ironically, both sides cite to the *Jennings* decision in support of their respective positions on whether the right in issue was clearly established. *See Jennings v. New York State*

*Off. of Mental Health*, 786 F.Supp. 376, 382, 384 (S.D.N.Y.1992), *aff'd*, 977 F.2d 731 (2d Cir.1992). Although the district court's decision was affirmed by the Second Circuit "for

from a qualified immunity perspective. In *Hope,* the Supreme Court explained that "officials can still be on notice that their conduct violates established law even in novel factual circumstances" when "the state of the law [at the time of the state action] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope,* —— U.S. at ——, 122 S.Ct. at 2516. In determining what the "state of the law" is in novel circumstances, the Court must look to "fundamentally similar" situations. *Id.;* see *Shabazz v. Coughlin,* 852 F.2d 697, 701 (2d Cir.1988).[18]

Situations governing strip and body cavity searches of prison visitors are, in the Court's opinion, the most fundamentally similar to the instant case. In those circumstances, the Second Circuit has ruled that, as early as 1989, strip searches of prison visitors without a reasonable suspicion violated clearly established law. *Varrone,* 123 F.3d at 78.[19] The same rule will be applied here. Thus, the Court finds that, as a broad principle, it was clearly

established on January 19, 2000 that a strip search of a psychiatric admittee, without individualized suspicion to believe that the admittee possessed drugs or weapon, violated the searchee's Fourth Amendment rights. By the same reasoning, the Court will conclude that it was clearly established that a strip search or body cavity search to discover stolen property that does not consist of drugs, weapons or other contraband that could pose a threat of harm to the searchee, other patients, or staff was constitutionally impermissible. *See Shain v. Ellison,* 273 F.3d 56 (2d Cir.2001). The Court will now address whether each defendant is entitled to qualified immunity based upon the respective claims against them.

## 6. Defendants' entitlement to Qualified Immunity

### a). Cavanaugh

 Inasmuch as defendant Cavanaugh is alleged to have ordered the search of Aiken without a reasonable

---

the reasons stated in Judge Goettel's opinion," that decision addressed whether the policy of New York Office of Mental Health (OMH) requiring at least one security hospital treatment assistant (SHTA) assigned to each psychiatric hospital ward to be same gender as the ward's patients was permissible as a "bona fide occupational qualification" under the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. Id.* The privacy rights of involuntary admittees in a psychiatric facility were addressed only tangentially to determine whether the State's requirement was *bona fide,* and it can hardly be said to constitute foreshadowing of how the Circuit would rule on the issue now before the Court. The relevant *dicta* of that decision addressed to the important and complex Fourth Amendment issue central to this dispute, *see* n. 13, *supra,* does not constitute a decision of the Circuit Court which defines with reasonable specificity or support the existence of the right now in issue.

**18.** The Second Circuit has long recognized the rule that even when no case is directly on point, the law can still be clearly established if decision in other yet similar areas "clearly foreshadow" a particular ruling on the issue.

**19.** The prisoner cases cited by the plaintiffs, *Shain v. Ellison,* 273 F.3d 56 (2d Cir.2001) and *Gonzalez v. City of Schenectady,* 141 F.Supp.2d 304 (N.D.N.Y.2001), do not considerably advance this analysis. These cases, as expressed in *Shain v. Ellison,* stand for the proposition that a blanket policy of strip searching all pre-trial detainees in a county jail without regard to individualized suspicion is not only contrary to law, but is so clearly contrary to established law in this Circuit that it eliminates a jail official's claim of qualified immunity for following such a policy. While psychiatric unit admittees may well have greater privacy rights than pre-trial detainees, here there is not a blanket policy of searching all admittees regardless of individualized reasonable suspicion.

suspicion that he possessed weapons or contraband, qualified immunity must be denied to her at this stage of the proceedings.[20] Such conduct violates the clearly defined rights which a reasonable competent state official should have been aware. Whether her actions were objectively reasonable under the circumstances cannot be determined at this stage. *See Martinez v. Simonetti*, 202 F.3d 625, 633 (2d Cir.2000). Therefore, she is denied qualified immunity.

### b). Nixon—Promulgation of Policy

■ Next, the Court turns to the claim against Nixon which is premised upon the promulgation of the instant policy. The Court concludes that he is entitled to qualified immunity on this claim. In this regard, it was not clearly established that a search conducted in accordance with CDPC's policy violated the searchee's constitutional rights. Indeed, based upon the fundamentally similar situation of searches of prison visitors, a reasonably competent state official would not have reason to believe that a search conducted upon indi-

vidualized reasonable suspicion that the prospective admittee possessed a weapon or drugs violated the searchee's constitutional rights.

As above indicated, the policy does not allow for the contested searches without individualized suspicion. Further, CDPC's search policy specifically provides that the level of intrusion into an admittee's privacy rights must be based upon the degree of individualized suspicion, and that the level of intrusion must be carefully tailored to address each person's individual situation.[21] A reasonable state official working for CDPC could assume that the policy's requirement that: (1) all searches required a "potential risk and/or reasonable possibility that the patient possesses" a weapon or contraband, combined with (2) the provision that strip searches are justified "on rare occasion, based on clinical judgement", and (3) that body cavity searches are justified only "upon reasonable belief and to prevent serious harm to themselves," meant that the such searches were allowed only upon possession of reasonable

20. At this stage, it is unclear what was the content or basis of the "standing order" issued by defendant Cavanaugh. It is possible that plaintiffs could establish facts demonstrating that Cavanaugh ordered her subordinates to search Aiken regardless of individualized suspicion, or perhaps even for some malicious personal motive. Given the constellation of factual possibilities surrounding this "standing order" which might establish that Cavanaugh ordered a strip search in contravention of the clearest Fourth Amendment dictates, qualified immunity is improper at this time for her.

21. Contrary to plaintiffs' assertion that the policy does not require a reasonable suspicion basis to conduct a search or a probable cause basis for a body cavity search, the reverse is true. The policy provides that the decision to search a patient (involving any search) is based upon "a determination that there exists potential risk and/or reasonable possibility

that the patient possesses an item restricted by his or her treatment team, an item considered to be contraband by local, state, or federal law, or an item that is stolen." The policy further provides that "on rare occasion, based on clinical judgement, a patient will be asked to submit to a body search and to disrobe down to their undergarments for the search.... [And], [u]pon reasonable belief and to prevent serious harm to themselves, a body cavity search" may be conducted. Under New York law, "probable cause" and "reasonable cause" are used interchangeably in many situations. *See e.g. Post v. Elser*, 1996 WL 406843, at *6 (N.D.N.Y. July 19, 1996)(" 'Reasonable cause' is equivalent to the constitutional 'probable cause' standard.")(quoting *Howard v. Schoberle*, 907 F.Supp. 671, 677 (S.D.N.Y.1995); *see also Mejia v. City of New York*, 119 F.Supp.2d 232, 253 (E.D.N.Y.2000)("Probable cause, or reasonable cause as it is known in New York law, exists when ...").

suspicion and/or probable cause to believe that the person possessed contraband (drugs) or a weapon. Further, the policy provides for safeguards addressed to the scope, nature, and conduct of the search.

Certainly, the ambiguity arising from the balance between a person's reasonable expectations of privacy when voluntarily admitting himself into a psychiatric crisis unit and the legitimate governmental interest in keeping illicit drugs and weapons out of the crisis unit as discussed above, combined with the case law that allows strip and body cavity searches of prison visitors suspected of possessing contraband, renders the law in this area far from clear.[22]

Turning to the issue of a strip search or body cavity search for stolen property (unless the stolen property was a weapon or drugs), even assuming the law was clearly established that such searches would be unjustified under the Fourth Amendment even with reasonable suspicion, the promulgation of the instant policy would not be objectively unreasonable.[23] Under the CDPC's policy, in order to conduct *any* strip search or body cavity search, there first must be a "clinical decision" that the search is necessary and only then under the supervision of a physician. Reason-

ably competent state officials in Nixon's position could certainly conclude that such a *proviso* excluded the possibility of strip or body cavity searches for stolen property of an innocuous nature. *See Poe v. Leonard*, 282 F.3d 123, 133 (2d Cir.2002); *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995). Put another way, under the policy a reasonably competent officials could understand that unless the stolen property was a weapon or drugs which would implicate the clinical judgment that the item(s) impacted the health and welfare of the searchee, other patients, or staff, a strip or body cavity search would not occur. At the least, a reasonable official in Nixon's position could disagree as to the legality of the policy as written, and therefore it cannot be said that the illegality of promulgating the policy was apparent. *See Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Thus, the Court concludes that Nixon is entitled to qualified immunity on this claim.

### d.) Nixon, Di Blasio & Glebba—Failure to Train

 Turning the failure to train claims against Nixon, Di Blasio and Glebba, the complaint asserts what seems to be two

---

22. Even accepting the well reasoned standard of *Carey*, the circumstances here are different in many respects. The searches are not of employees at prisons conducted for purposes of preventing the patently criminal infiltration of contraband into the prison, but rather at a mental health facility for the purpose of protecting the well being of the patient patients and staff. The searches are conducted pursuant to a policy that requires varying levels of individualized suspicion depending upon the level of intrusiveness occasioned by each particular search. The policy mandates the circumstances of a search (at least according to the terms of the policy) which, to a reasonable official based upon state of the law at the time, would appear reasonable. For instance, the more intrusive searches are, at least ac-

cording to the policy, conducted under the supervision of a physician in a setting similar to that used in medical procedures. *See Schmerber v. California*, 384 U.S. 757, 767, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)(in addition to the individualized suspicion determination, the Court must consider whether the manner and circumstances of the intended intrusion are reasonable).

23. While the question of objective reasonableness is generally not susceptible to resolution on a Rule 12(b)(6) motion, here, at least with regard to the claim as Nixon based upon the promulgation of the policy, there exists no factual dispute. The Court assumes that Nixon did, in fact, promulgate this policy.

separate theories: 1) that these defendants did not train the staff to follow the procedures in the policy; and, 2) that they did not train the staff to follow "lawful rules and procedures for searching patients" *other* than in the CDPC policy. Compl. ¶ 82, *see* compl. ¶¶ 81–86.[24]

The Court finds that these defendants are entitled to qualified immunity on the theory that they failed to train staff on rules and procedures for searching patients *other* than those contained in the CDPC policy. For the reasons discussed above, a reasonably competent state official in each defendant's respective position would not know that the failure to train the staff in policies and practices *other* than contained in the official policy violated clearly established law.

■■■ With regard to the theory that the defendants are liable for failing to train staff to comply with the instant policy and prevent transgressions such as occurred with regard to Aiken's search, the existence of disputed material facts at this stage of the litigation prevents the Court from granting qualified immunity. It is unclear at this stage whether each defendant had such a duty; whether the staff received such training; and whether any of the defendants had notice that the staff would deviate from the policy in a constitutionally material respect. *See Poe*, 282 F.3d at 134–35. Assuming that the plaintiff can establish· that defendants had knowledge or reason to believe that the individual searchers would act in a manner patently in violation of clearly established rights, the plaintiffs could prevail on a failure to train theory and therefore qualified immunity would be inappropriate. The Court must indulge these probabilities

(allowing the disputed facts to be fleshed out through discovery and possibly trial), and therefore qualified immunity is denied to these defendants on the theory that they are responsible for failing to train staff to comply with CDPC's search policy.

## H. ASSAULT AND BATTERY CLAIM AGAINST DEFENDANT CAVANAUGH

The Second Amended Complaint alleges a state law cause of action against Defendant Cavanaugh sounding in assault and battery. Defendants argue that this claim must be dismissed because it is untimely and without merit.

### 1. Statute of Limitations

Under New York State law there is a one year statute of limitations for a claim of assault ·and battery. N.Y. C.P.L.R. § 215(3). According to the defendants, the claim against Cavanaugh was added on October 1, 2001, three years after she allegedly placed a note in plaintiff Aiken's crisis file and approximately twenty-two months after the alleged unlawful search. Defendants further assert that the claim does not relate back to the filing of either prior complaint under FED. R. CIV. PRO. 15, and therefore must be dismissed. Plaintiffs assert that the statute of limitations is equitably tolled because Cavanaugh destroyed her written order and thereby "fraudulently concealed her wrongful conduct, and her personal involvement." Plaintiffs argue that "therefore Aiken did not know he had a cause of action against Cavanaugh. As a result, plaintiff Aiken did not learn of the facts regarding Cavanaugh's involvement until Cavanaugh was deposed as a non-party witness on July 12,

---

**24.** These defendants are not alleged to have had any direct involvement in the search of Aiken or of any search occurring in contravention of the stated policy, but instead are alleged to have supervisory liability only as a direct result of application of the search policy.

2001." Plaintiffs further contend that they need discovery to establish the basis for equitable tolling.

 The doctrine of equitable tolling allows a plaintiff to file his claim outside of the applicable statute of limitations if, because of some action on a defendant's part, the plaintiff was unaware that the cause of action existed. *Long v. Frank*, 22 F.3d 54, 58 (2d Cir.1994); *Simcuski v. Saeli*, 44 N.Y.2d 442, 443, 406 N.Y.S.2d 259, 377 N.E.2d 713 (1978). Further, the doctrine of fraudulent concealment prevents a party from fraudulently concealing wrongdoing until after the tolling of the statute of limitations, *New York v. Hendrickson Brothers, Inc.* 840 F.2d 1065, 1083 (2d Cir.1988), and the related doctrine of spoliation seeks to discourage litigants from intentionally or negligently disposing of crucial items of evidence before an adversary has an opportunity to inspect them. *Kirkland v. New York City Housing Authority*, 236 A.D.2d 170, 666 N.Y.S.2d 609 (1st Dept.1997).

Based upon the factual disputes that underlie the question of whether any of these equitable doctrines should apply, the motion is denied.

## 2. Merits of "assault & battery claim."

 Defendants also argue that the assault and battery claim is without merit and should be dismissed. In this regard, defendants argue that the mere placing of a note in a patient's emergency crisis folder by a nursing supervisor ordering that he be searched carefully upon admission does not, as a matter of law, constitute an assault or battery in New York. Further-

more, defendants argue that plaintiffs' complaint is wholly devoid of any allegations that Cavanaugh committed an overt act encouraging or aiding and abetting in the alleged unlawful search of Aiken on January 19, 2000. Plaintiffs assert that Cavanaugh issued the order without regard to whether there was lawful basis to do so. Compl. ¶¶ 32–38. Plaintiff further contend that "Aiken learned of the order, and was placed in fear of a humiliating search." Compl. ¶¶ 44–45.

It is possible on this record that the plaintiffs could establish that Cavanaugh's "standing order" constituted an intentional or deliberate act directed at causing harm which would rise to the level of actionable conduct in relation to the subject assault. *See Crespi v. Ihrig*, 99 A.D.2d 717, 718, 472 N.Y.S.2d 324 (1st Dept.1984), *aff'd*, 63 N.Y.2d 716, 480 N.Y.S.2d 205, 469 N.E.2d 526 (1984).[25] Consequently, the motion to dismiss is denied.

## I. *Absolute Immunity as to Plaintiffs' Negligence Claim.*

 Plaintiffs also bring a common law negligence action against defendants Nixon, Glebba, and Di Blasio for their alleged negligent failure to train CDPC employees. Defendants contend that the claim must be dismissed as matter of law.

 Under New York State law, "when official action involves the use of discretion, the officer is not liable for the injurious consequences of that action even if resulting from negligence or malice." *Tango v. Tulevech*, 61 N.Y.2d 34, 40, 471 N.Y.S.2d 73, 459 N.E.2d 182 (1983); *Della Villa v. Constantino*, 246 A.D.2d 867, 869,

25. Plaintiffs' argument that Aiken learned of the order which in turn placed him in fear of repeated searches appears to be contrary to their argument for equitable tolling where they assert that he did not know about it after

the action was sued. However, in an effort to afford the plaintiffs the benefits of alternative pleading, the claim will be allowed to stand at this juncture of the case.

668 N.Y.S.2d 724 (3d Dept.1998). In other words, New York State officials are entitled to absolute immunity in the exercise of their discretionary powers. The authority for officials of the Office of Mental Health to conduct training emanates from Mental Hygiene Law § 7.23 by which the Legislature has unambiguously vested the relevant state officials with the discretion to create and conduct training as they see fit.[26] Moreover, the relevant statutes place this authority solely in the hands of the Commissioner and facility directors and not his "designees" as plaintiffs maintain. Compl. ¶ 137. As this power is discretionary, defendants are entitled to absolute immunity from plaintiffs' negligence claims and these claims must be dismissed.

## IV. CONCLUSION

For the reasons discussed above, defendants' motion is **granted in part and denied in part**. In this regard:

The claims brought under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* and Section 504 of the Rehabilitation Act of 1973 are **DISMISSED**;

All claims brought under 42 U.S.C. § 1983 and state common law seeking monetary damages against the State of New York (including claims against the Capital District Psychiatric Center and the individual defendants in their official capacities) are **DISMISSED**;

Defendant Nixon is **granted qualified immunity** on any claim asserting personal liability against him on the ground that he promulgated the Capital District Psychiatric Center's search policy; and

---

**26.** Mental Hygiene Law § 7.23(a) grants the commissioner of mental health the authority "to establish such programs of training and education related to mental illness *as he shall deem desirable.*" (Emphasis added). Mental Hygiene Law § 7.23(b) states that the *director*

Defendants Nixon, Di Blasio and Glebba are **granted qualified immunity** on any claims premised on the theory that they are individually liable for failing to train staff on rules and procedures for searching patients *other* than those contained in the CDPC policy.

The motion is, in all other respects, **DENIED.**

**IT IS SO ORDERED.**

of an Office of Mental Health facility "with the approval of the commissioner of mental health *may* establish and supervise training and education programs for employees." (Emphasis added).